Hawa Abdi **JAMA**, et al., Plaintiffs,

v.

**UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE**, et al., Defendants.

**Samson Brown, et al., Plaintiff, on behalf of themselves and all others similarly situated,**

v.

**Esmor Correctional Services, Inc., et al., Defendants.**

**Civil Nos. 97–3093(DRD), 98–1282(DRD).**

United States District Court, D. New Jersey.

Nov. 10, 2004.

side the District of New Jersey pending reso- lution of any appeal from this decision.

See also 334 F.Supp.2d 662.

**344**

Frank Askin, Esq., Penny M. Venetis, Esq., Rutgers Constitutional Litigation Clinic, Rutgers Law School, Newark, NJ, Sean Mack, Esq., Debevoise & Plimpton, New York, NY, for Plaintiffs in Jama v. INS, Hawa Abdi Jama et al.

Bruce J. Ressler, Esq., Ellen R. Werther, Esq., Ressler & Ressler, New York, NY, for Plaintiffs in Brown v. Esmor, Samson Brown, et al.

Steven D. Weinstein, Esq., J. Llewellyn Mathews, Esq., Blank Rome LLP, Cherry Hill, NJ, Larry S. Reich, Esq., Blank Rome LLP, New York, NY, Frank R. Volpe, Esq., Ryan D. Nelson, Esq., Sidley, Austin, Brown & Wood, LLP, Washington, DC, for Defendants Esmor Correctional Services, Inc., James F. Slattery, John Lima, Richard Staley, and Aaron Speisman.

Edward R. Murphy, Esq., Elizabeth Dalberth, Esq., Murphy and O'Connor, Cherry Hill, NJ, Marvin C. Moos, Esq., Ebanks, Smith & Carlson, LLP, Houston, TX, for Defendants Michael D. Rozos, Earline Boyer, Alan Friess, Norman Uzzle, and David McLean.

E. Carr Cornog, Esq., Rotolo Midlige, Lebanon, NJ, for Defendants Willie O. Hunter and Michael Jackson.

Gloria Cherry, Esq., Braff, Harris & Sukoneck, Livingston, NJ, for Defendants Tommie Lee Brown, Robert Snead, Okay Nkenke, Phillip Johnson, and Kevin Brodie.

Jeffrey M. Kadish, Esq., Morgan, Melhuish, Monaghan, Abrutyn & Lisowski, Livingston, NJ, for Defendants Dorian Hunter, Michael Melendez, James Stratford, and Corey Stratford.

Gerald D. Siegel, Esq., Vidya Prasad, Esq., Siegel & Siegel, P.C., Plainsboro, NJ, for Defendant Irving Brown.

John B. Livelli, Esq., Robinson & Livelli, Newark, NJ, for Defendant Willard Stovall.

### *OPINION*

DEBEVOISE, Senior District Judge.

## TABLE OF CONTENTS

*Introduction* ........................................................ 345
*Background* ........................................................ 345
A. Procedural Background ........................................ 345
 1. The Brown Action ......................................... 346
 2. The Jama Action .......................................... 347
B. The Pending Jama Motions .................................... 352
C. General Allegations of Facility Conditions ..................... 352
*INS Officials* ...................................................... 353
*Recent Legal Developments* ........................................ 357
A. Sosa .......................................................... 357
B. Malesko ...................................................... 361
C. Statute of Limitations ........................................ 363
D. RFRA ........................................................ 366
 1. Constitutionality as Applied to Federal Government ......... 367
 2. Claims Against Individual Defendants for Money Damages ... 371
*Discussion* ........................................................ 376
A. Issues Determined in 2004 Brown Opinion ..................... 376

B. Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 377
C. Esmor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 378
D. Esmor Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 379
E. Esmor Guards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 381
 1. Hawa Abdi Jama . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 382
 2. Anantharajah Jayakumar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 382
 3. Abu Bakar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 382
 4. Cecilia Roe Jeffrey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 383
 5. Abraham Kenneh . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 384
 6. Dennis Raji . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 384
 7. Agatha Serwaa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 384
 8. Shamimu Nanteza . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 385
 9. Sarah Yower . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 385
 10. Esmor Guards' Motion Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 385
*Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 385

## Introduction

This is the second of two opinions that resolve numerous defense motions for summary judgment and for related relief in two actions instituted by undocumented aliens who were detained at a facility that the Immigration and Naturalization Service ("INS") maintained in Elizabeth, New Jersey pending determination of their asylum status. Esmor Correctional Services, Inc. (now Correctional Services Corporation) ("Esmor") operated the facility under contract with the INS.

The first action, *Brown v. Esmor Correctional Services, Inc., et al.*, Civil No. 98–1282 ("the *Brown* action") is a class action that was filed in the Supreme Court of the State of New York on or about March 6, 1996. Defendants in the case removed it to the United States District Court for the Southern District of New York on April 10, 1996 based upon diversity and federal question jurisdiction. On March 11, 1998 that court transferred the action to this court.

The second action is *Jama v. United States Immigration and Natural Service, et al.*, Civil Action No. 97–3093, filed in this court on June 16, 1997. In a first amend-ed complaint twenty individual plaintiffs named as defendants the INS, Esmor, forty-four named individuals and John and Jane Does 1–50 [1].

The defendants in each of these two actions filed motions for summary judgment and for related relief. Because the legal issues were more complex in the *Jama* action, the motions in the *Brown* action were addressed first and resolved in an opinion dated September 9, 2004, *Brown v. Esmor Correctional Services, Inc.*, 334 F.Supp.2d 662 (D.N.J.2004) (the "2004 Brown Opinion"). A number of the legal issues are common to the two actions, and to the extent they were resolved in the *Brown* Action they will be deemed resolved for the purposes of this action. For a complete understanding of the contentions raised in *Jama,* it will be necessary to incorporate herein portions of the *Brown* opinion.

## Background

### A. Procedural Background

The Plaintiffs in the *Brown* and *Jama* actions are foreign nationals and refugees who sought political asylum in the United States. They were taken into custody by

---

1. For a time a related individual action was pending, *Joaquin DaSilva v. Esmor Correctional Services Incorporated, et al.*, Civil Action No. 96–3755 ("the *DaSilva* Action"), but it was dismissed without prejudice and the plaintiffs became members of the *Brown* action class.

the INS and incarcerated at the facility that Esmor operated in Elizabeth (the "Facility"). Esmor manages and operates for-profit corrections and detention facilities for federal, state and local corrections and other agencies.

The Facility was in operation from approximately August 1994 to July 1995. On June 18, 1995 the detainees rioted, and the Facility was shut down shortly thereafter. The detainees were transferred elsewhere in the United States or were deported.

In both the *Brown* and *Jama* actions the Plaintiffs allege that while they were detainees at the Facility they were tortured, beaten, harassed, and otherwise mistreated by Esmor guards, and that they were subjected to abysmal living conditions including inadequate sanitation, exercise, and medical treatment.

### 1. The *Brown* Action

The *Brown* action names a number of class Plaintiffs (reduced in number since the original complaint was filed) who sue on behalf of themselves and all others similarly situated. On April 24, 1998 the Court certified a class-namely, all detainees who were incarcerated at the Facility during its operation from August 1994 to July 1995. Originally the Brown action named as defendants corporations affiliated with Esmor and two of Esmor's officers. Discovery proceeded. By order dated October 27, 2003 the claims against all the corporate entities other than Esmor and the claims against the officers were dismissed with prejudice. Thus Esmor remained the sole Defendant in the *Brown* action.

In view of the Supreme Court decision in *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001), which was decided after the *Brown* action was commenced, the plaintiff class acknowledged that its claims against Es-

mor arising under the United States Constitution were no longer viable.

At the time Esmor's motions were filed four claims remained in the *Brown* action: (i) a claim based on Esmor's knowing, reckless, and intentional failure to properly screen, hire, train, and supervise its employees; (ii) a claim based on Esmor's negligent hiring, training and supervision of the Esmor guards; (iii) a claim of Esmor's respondeat superior liability for the negligent and/or intentional acts of the Esmor guards whom it employed; and (iv) the claim of the plaintiff class members against Esmor as third-party beneficiaries of the Esmor contract with the INS for damages suffered as a result of Esmor's breach of that contract. These are all state law claims.

In opposing the motion for summary judgment the *Brown* action plaintiffs made extensive use of the interim assessment report on the Elizabeth facility prepared by INS officials at the direction of INS Commissioner Doris Meissner. Esmor contended that the Report is inadmissible hearsay and contended that it had not been authenticated and was inadmissible under Fed.R.Evid. 403. The 2004 *Brown* Opinion rejected these objections, and for the reasons set forth in that opinion they will be rejected in this opinion.

Relying on New Jersey law the court denied Esmor's motion for summary judgment on the class plaintiffs' claims based on negligent hiring, retention, training and/or supervision. The court granted Esmor's motion for summary judgment on the class plaintiffs' claim that Esmor knowingly, recklessly and intentionally failed to screen, train and supervise employees and on the class plaintiffs' claims as purported third party beneficiaries of the Contract between Esmor and the INS. As previously noted, in view of the Su-

preme Court decision in *Malesko* the Plaintiff class acknowledged that their claims against Esmor under the U.S. Constitution are no longer valid and that developments in the law since the commencement of the action had prompted them to withdraw their claims based upon 8 U.S.C. § 1362.

### 2. The *Jama* Action

The *Jama* complaint was filed in this Court on June 16, 1997, a significant date, as will be noted below.

The Defendants fall into various categories: (i) Esmor, (ii) Esmor officers ("Esmor Officers"), (iii) Esmor Guards ("Esmor Guards"), (iv) the INS and (v) INS officials ("INS Officials").

In the *Jama* action Plaintiffs asserted numerous claims against each of these categories of defendants. Counts 68–84 accused the Esmor Guards of violations of the First, Fifth, and Thirteenth Amendments to the United States Constitution, numerous provisions of the New Jersey Constitution, the International Covenant on Civil and Political Rights ("ICCPR"), customary international law, the Alien Tort Claims Act, 28 U.S.C. § 1350 ("ATCA"), the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb, et seq. ("RFRA"), the Fair Labor Standards Act, and New Jersey law. With the exception of counts 80 (failure to compensate employees under the Fair Labor Standards Act) and 83 (failure to ensure the safety of Plaintiffs' confiscated property under New Jersey law), all these counts asserted active violations of detainees' rights by the guards themselves.

In counts 50–67 the *Jama* Plaintiffs made corresponding allegations against the Esmor Officers—predicating the officers' liability for the actions of the guards on "failing to curb" the pattern of abuse, or "deliberate indifference," and, in the case of the New Jersey tort law claims, on theories of respondeat superior and of negligent hiring, training, and supervision.

The claims against Esmor as a corporation (counts 31–49) were equivalent to those against the Esmor Officers, with the addition of a breach of contract claim (count 33) alleging that the *Jama* plaintiffs were third-party beneficiaries of Esmor's contract with the INS and that they were harmed by Esmor's breach of that contract. The language of count 37 was a little different from that of count 55: in the former the corporation was accused simply of failing to take appropriate steps to ensure that property was protected; in the latter the officers were accused of acting with deliberate indifference to the plaintiffs' being deprived of property.

In counts 13–30 the *Jama* plaintiffs invoked the same rights against the INS Officials as they did against the Esmor Officers—advancing theories of liability based on omissions—"failing to curb" and "deliberate indifference." In their claims under New Jersey law, the *Jama* plaintiffs alleged negligent hiring and supervision, the breach of a duty to ensure the safety of plaintiffs' confiscated property, and the breach of a duty to ensure plaintiffs' safety from abuse.

Finally, in counts 1–12 the *Jama* plaintiffs asserted claims against the INS—invoking New Jersey tort and contract law, the ICCPR, customary international law, the RFRA, and the ATCA. In all counts other than those invoking New Jersey law, INS liability was predicated upon its failure to curb abuses at the Esmor facility. In alleging violation of New Jersey tort law, the *Jama* plaintiffs advanced theories of respondeat superior, of negligent hiring and supervision, and of failure to ensure that plaintiffs could recover their confiscated property.

In 1998 the INS moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(1) and 12(b)(6) or, in the alternative, for summary judgment. INS Officials Alan Freiss, Norman Uzzle, Michael Rozos, Earline Boyer and David McLean joined the INS's motion. The United States was substituted as a defendant as to the claims against the INS Officials based on New Jersey state law and the New Jersey constitution. The INS Officials urged that all of the remaining claims should be dismissed except those based upon the First and Fifth Amendments of the United States Constitution.

Esmor, the Esmor Officers and the Esmor Guards (collectively, "the Esmor Defendants") joined in the motion and argued for dismissal of several of the claims asserted against them: (i) those founded upon the Fair Labor Standards Act, (ii) the Thirteenth Amendment claims, (iii) claims arising under the New Jersey Constitution, (iv) the RFRA claims, (v) the ATCA claims, and (vi) claims arising under the ICCPR and customary international law.

The Court issued its opinion addressing the motion on October 1, 1998 ("the 1998 Opinion"), *Jama v. INS*, 22 F.Supp.2d 353 (D.N.J.1998). The rulings in that opinion bear upon the pending motions for summary judgment, although intervening developments in the law affect some of those rulings.

The opinion dealt with the claims brought under international law and the effect of the ATCA, 28 U.S.C. § 1350, which gives district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." The opinion noted that for a treaty to confer rights enforceable by private parties it must be self-executing, that is, it must require no legislation to make it op-

erative. The opinion further noted that none of the treaties or other international instruments upon which the *Jama* plaintiffs rely (including, for example, the ICCPR) are self-executing or have implementing domestic legislation, and they do not per se provide a basis for suit under the ATCA. Rather, the *Jama* plaintiffs rely upon them to establish what constitutes the current "law of nations," or international law, that may be sued upon under the ATCA. The opinion held that international law was available to plaintiffs notwithstanding the fact that plaintiffs had available to them domestic law remedies:

> For the purposes of the present motions, the allegations of the complaint must be accepted as true and all reasonable inferences favorable to plaintiffs must be drawn from them. When this is done, it is evident that the totality of the treatment to which plaintiffs were subjected violated customary international law as it is now established.

> . . .

> The mental and physical abuses which are alleged to have been inflicted upon plaintiffs violate the international human rights norm of the right to be free from cruel, unhuman and degrading treatment. The ATCA confers federal subject matter jurisdiction when i) an alien sues ii) for a tort iii) committed in violation of the law of nations (i.e., international law), *Kadic[ v. Karadzic]*, 70 F.3d [232] at 238 [(2nd Cir.1996)]. The complaint sufficiently alleges all three jurisdictional requirements.

22 F.Supp.2d at 363.

The opinion also held that the availability of other remedies did not bar on ATCA action:

> Contrary to defendants' argument, there is no absolute preclusion of international

law claims by the availability of domestic remedies for the same alleged harm.

. . .

Perhaps if there were domestic law in conflict with the norms of international law, domestic law should prevail. That is not the case here where domestic law is consistent with international norms. There is nothing in the ATCA which limits its application to situations where there is no relief available under domestic law. There is no reason why plaintiffs cannot seek relief on alternative grounds.

22 F.Supp.2d at 364

As to the INS, the 1998 Opinion held that [t]he ATCA, in providing jurisdiction and a right of action under the law of nations, does nothing to displace sovereign immunity, and plaintiffs' claims against the INS based on the ATCA must be dismissed." 22 F.Supp.2d at 365.

As to the INS Officials, the 1998 Opinion held that, because they were being sued in their individual capacities, they are not entitled to sovereign immunity and that the viability of the *Jama* plaintiffs' ATCA claims against them had best be decided in the context of a motion for summary judgment.

Similarly Esmor's, the Esmor Officers' and the Esmor Guards' motions to dismiss were denied. The 1998 Opinion held that the Esmor Defendants "were performing governmental services. Thus they were state actors and it is unnecessary to address the question raised in *Kadic*, namely the extent to which non-state actors can be

sued under the ATCA." 22 F.Supp.2d at 365–66.

The ATCA rulings with respect to the INS Officials were applicable to the ATCA claims against the Esmor defendants and required that their motions to dismiss be denied.[2]

It is unnecessary to set forth the rationale for the remaining conclusions recited in the 1998 Opinion. A summary of the rulings is set forth the opinion's conclusion:

The INS motion to dismiss i) all claims brought against it under ATCA or otherwise based upon customary international law, ii) claims brought against it under the FTCA; iii) claims brought against it arising out of the New Jersey Constitution and iv) claims against it deriving from the contract between Esmor and INS will be granted. The INS motion to dismiss claims arising under RFRA will be denied without prejudice to renewal of the motion.

The First Amended Complaint in this action will be amended to name the United States the defendant on plaintiffs' FTCA claims, and the United States shall be deemed to have moved to dismiss plaintiffs' FTCA claims. The motion of the United States to dismiss the FTCA claims will be granted except with respect to the property claims of plaintiffs who submitted administrative property loss claims setting forth the amounts or estimated amounts of their property losses.[3]

The motion of the INS Officials to dismiss i) claims brought against them under ATCA based upon customary international law, ii) claims brought against

---

**2.** The subsequent Supreme Court opinion in *Malesko* requires that at least as to Esmor these rulings be revisited on the present summary judgment motions.

**3.** Sufficient property claims were submitted by *Jama* Plaintiffs Addai, Anang, Awotwe, Badjoko, Baker, Crespo, Jama, Jeyakumar, Kenneh, Manoharan, Manu, Raji, and perhaps Serwaa.

them arising under RFRA, iii) claims brought against them arising under the Thirteenth Amendment of the United States Constitution and iv) claims brought against them arising under FLSA will be denied without prejudice to renewal of the motion after discovery has been substantially completed. The motion of the INS Officials to dismiss claims brought against them under New Jersey tort and constitutional law is granted.

The motion of the Esmor defendants to dismiss i) claims brought against them under ATCA based upon customary international law, ii) claims brought against them arising under RFRA, iii) claims brought against them arising under the Thirteenth Amendment of the United States Constitution, and iv) claims brought against them arising under FLSA will be denied without prejudice to renewal of the motion after discovery has been substantially completed.[4]

22 F.Supp.2d at 372

On October 30, 2001 the United States and the INS settled the *Jama* plaintiffs' claims. The settlement agreement provides:

1. In this Settlement Agreement, plaintiffs and the government defendants settle any and all claims filed against the INS and/or the United States, including those stated in the first amended complaint filed on September 23, 1997, in *Jama, et al. v. INS, et al.,* Civ. No. 97–3093(DRD) (D.N.J.) (the "lawsuit"), alleging, *inter alia,* tort liability for damage to property and for emotional damages, violations of United States obligations under various international treaties, and violations of the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb.

The *Jama* plaintiffs contend that this agreement simply settled their RFRA claims against the United States and the property loss claims of five of these plaintiffs against the United States and did not settle their multiple claims against the INS Officials. That is an issue that remains to be resolved on the motion of the INS Officials for summary judgment.

At a very late date in the proceedings there arose the question whether the *Jama* plaintiffs had effectively opted out of the *Brown* action and whether they should be precluded from proceeding independently. By reason of the extraordinary difficulties that counsel for the *Jama* plaintiffs had encountered communicating with their clients, they had not complied with the literal provisions of the order governing requests for exclusion. The magistrate judges handling this case and this Court entered several orders dealing with this problem. It is unnecessary to recount the details of the proceedings. Suffice it to say, by a June 10, 2003 order[5] the Court ruled that the following persons who were originally named as plaintiffs in the *Jama* action had successfully opted out of the *Brown* action and continued as individual plaintiffs in the *Jama* action:

Hawa Abdi Jama

Anantharajah Jeyakumar

Abu Bakar

Cecilia Kou Jeffrey

Abraham Kenneth [Kenneh]

Dennis Raji

---

**4.** In light of the Court of Appeals decision in *Tourscher v. McCullough,* 184 F.3d 236 (3d Cir.1999) the *Jama* Plaintiffs voluntarily agree to dismiss their FLSA claims against all defendants.

**5.** The Esmor defendants' appealed the Court's order validating the opt out notices of nine *Jama* action plaintiffs. The appeal is still pending before the Court of Appeals.

Agatha Serwaa

Shamimu Nanteza

Sarah Tetteh Yower

The other persons named as plaintiffs in the *Jama* action have failed to opt out effectively and consequently are members of the *Brown* action class. They will be dismissed from the *Jama* action without prejudice to their right to pursue their class action remedies.[6]

As a result of these developments in the *Jama* action only the nine individual Plaintiffs listed above remain in the case.[7]

There are four categories of defendants: (i) the INS Officials, (ii) Esmor, (iii) Esmor Officials and (iv) the Esmor Guards.

The INS Officials who are defendants and subject to the jurisdiction of the Court are Michael Rozos, Earline Boyer, Alan Friess and Norman Uzzle.[8] The claims against these Defendants surviving the 1998 Opinion were (i) a Fifth Amendment due process claim based on the alleged failure to curb the pattern of abuse at the facility, (ii) alleged violations of customary international law as informed by various treaties and conventions; (iii) a First Amendment claim that these defendants acted with deliberate indifference towards the *Jama* plaintiffs' attempts to exercise their religions, (iv) violation of RFRA, 42

U.S.C. § 2000 b, et seq., by substantially burdening these plaintiffs' right to free exercise of their religions, (v) violation of the Thirteenth Amendment by acting with deliberate indifference towards the *Jama* plaintiffs engaging in forced, unpaid labor, (vi) alleged violation of FLSA[9] and (vii) alleged violation of the ATCA.

The claims against Esmor are as follows[10]: (i) a claim based on the ATCA on account of alleged violations of customary international law; (ii) alleged violation of RFRA; (iii) New Jersey state law claims of failing to protect Plaintiffs' property, negligent hiring, training, supervision and retention of its employees, and intentional infliction of emotional distress; (iv) a claim for breaches of the contract between the INS and Esmor under which the *Jama* plaintiffs were allegedly third party beneficiaries. The claims listed in (iii) and (iv) above correspond with claims that the *Brown* action advances.

The Esmor Officers are James Slattery (Esmor's President and CEO), Aaron Speisman (Esmor's Vice President of Finance), John Lima (a facility administrator for a period of time and assistant facility administrator for a period of time), Willard Stovall (facility administrator for a period of time) and Richard Staley. The claims asserted against these officers are as fol-

---

6. None of the plaintiffs in the *DaSilva* Action opted out of the *Brown* action effectively. The *DaSilva* complaint has been dismissed without prejudice to the right of the *DaSilva* plaintiffs to pursue their class action remedies.

7. The *Jama* plaintiffs have agreed to dismiss their claims against INS official David McLean.

8. Twenty plaintiffs were named in the First Amended Complaint. Only nine have actively prosecuted the case through the *Jama* action counsel. The others have been sent to other detention centers in the United States or have

been deported or voluntarily left the United States. Counsel has been unable to communicate with them, and they have not opted out of the *Brown* action. The claims of these *Jama* plaintiffs will be dismissed without prejudice and they will be recognized as members of the *Brown* action class.

9. As noted above, plaintiffs have agreed to drop their FLSA claims.

10. The *Jama* plaintiffs agree that under *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) their constitutional claims against Esmor must be dismissed.

lows: the claims listed as claims (i) through (vii) asserted against the INS Officials and (viii) New Jersey state law claims of failing to protect plaintiffs' property, negligent training and supervision.

The Esmor Guards are Willie O. Hunter, Michael Jackson, Tommie Lee Brown, Robert Snead, Okay Nkenke, Phillip Johnson, Kevin Brodie, Dorian Hunter, Michael Melendez, James Stratford, Corey Stratford, and Irving Brown. Of necessity the claims against each Esmor guard are unique to that guard, and each guard's summary judgment motion can only be resolved in the context of his own actions or inactions. In general terms the claims asserted against the guards are similar to most of the ATCA and international law claims, constitutional claims and state law claims that are asserted against the INS Officials.

## B. The Pending *Jama* Motions

In the *Jama* action the following motions were filed:

The INS Officials moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the plaintiffs' *Bivens* (First, Fifth and Thirteenth Amendment) claims for failure to state a claim in that they are barred on their face by the applicable statute of limitations. They also moved for summary judgment on the remaining claims against them.

Esmor and the Esmor Officers moved for summary judgment.

Esmor officer Stovall moved for summary judgment.

Esmor Guards Willie O. Hunter and Jackson moved for summary judgment.

The claims against Willie O. Hunter were dismissed at oral argument with Plaintiffs' consent (June 30, 2004).

Esmor Guards Tommie Lee Brown, Snead, Nkenke, Johnson and Brodie moved for summary judgment. The claims against Tommie Lee Brown and Snead were dismissed at oral argument with Plaintiffs' consent (June 30, 2004).

Esmor Guards Dorian Hunter, Michael Melendez, James Stratford and Corey Stratford moved for summary judgment. The Claims against James Stratford and Corey Stratford were dismissed at oral argument with Plaintiffs' consent (June 29, 2004). (A consent order granting summary judgment in their favor was entered in favor of James Stratford and Corey Stratford on July 13, 2004.)

Esmor guard Irving Brown moved for summary judgment and moved for leave to file an amended answer to assert the affirmative defense of qualified immunity. The claims against him were dismissed at oral argument with plaintiffs' consent June 29, 2004. Subsequently, an order granting summary judgment in his favor was entered on July 13, 2004.[11]

## C. General Allegations of Facility Conditions

Ultimately it will be necessary to deal with the evidence that each individual plaintiff proffers to establish his or her claim, and by the same token it will be necessary to marshal the evidence against each defendant separately, recognizing, of course, that under the doctrine of respondeat superior the actions of Esmor guards and officers may be attributed to Esmor.

---

11. That order was entered on the assumption that *Jama* plaintiffs had consented to it. Subsequently a dispute has arisen as to exactly what *Jama* plaintiffs intended to agree to at oral argument: they contend that they agreed to the dismissal of claims against Irving Brown but not to the entry of judgment in his favor. The court and the parties are awaiting the preparation of a transcript of the proceedings, which will reveal whether the entry of judgment was in fact appropriate.

It will be useful at the outset to set forth in broader terms the kinds of conduct and conditions upon which the *Jama* plaintiffs rely.

Plaintiffs alleged that conditions in the Facility were subhuman. Twenty to forty detainees were held in large, one-room dormitories. They were often overcrowded and by reason of lack of beds mattresses were placed on filthy floors. Dirty showers and toilets were located near plaintiffs' sleeping and eating areas. The dorms smelled of human waste, and showers and toilets were often broken and remained unrepaired. The detainees were given inadequate cleaning materials and could not clean their living areas. There was a lack of privacy when plaintiffs used the toilets and showers, where they were visible from each other and from guards who taunted and mocked them.

The guards joked about detainees' sexual organs and ridiculed both men and women while they showered. The temperature in the Facility was freezing in the winter and stifling in the summer. Complaints went unanswered. In the worst of the heat detainees were forced to work unbearable hours.

The detainees were deprived of sleep. Bright lights were kept on 24 hours a day. Blankets were yanked from detainees heads when they sought to escape the glare. Guards woke up the detainees during the nights, taunted them, created loud noise and occasionally sexually abused them.

Plaintiffs were deprived of both indoor and outdoor recreation and such recreation facilities as there were, were totally inadequate.

The food was both inadequate and spoiled; the tap water was dirty. Foreign materials were found in the food and liquids. As a result detainees suffered from intestinal problems—diarrhea and vomiting. When they purchased supplemental food from the commissary much of it was stolen before delivery to them.

The plaintiffs were given inadequate clothing and that which was given to them was often filthy. Similarly towels, sheets and blankets were filthy when they were given at all. There was a lack of toilet paper, sanitary napkins and other basic hygiene products such as soap, razor blades, toothbrushes and toothpaste.

Detainees were beaten, confined without cause to solitary confinement and sexually abused and humiliated on repeated occasions. Complaints of such conduct fell on deaf ears.

Racial epithets were commonplace; strip searches were unjustified and abusive; access to legal materials and counsel was denied; religious dietary laws were not accommodated and in many ways plaintiffs' religious rituals and prayers were interfered with; proper medical care was denied.

The Facility was understaffed, and its staff was inexperienced and lacked proper training.

These general conditions and kinds of conduct are disclosed in graphic detail in the testimony and interrogatory answers of detainees, in the INS Investigative Report and in documents.

### INS Officials

█ The settlement agreement between the plaintiffs and the United States and INS, dated on or about October 30, 2001, settled *any and all claims* between the parties. The INS Officials Friess, Uzzle, Rozos and Boyer [12] asserted that as a result of this settlement, all claims brought

---

**12.** INS Official David McLean was dismissed from the *Jama* Action by consent.

by the plaintiffs against both the INS and its Officials have been barred. The specific language of the settlement agreement states:

In this Settlement Agreement, plaintiffs and the government defendants settle *any and. all claims* filed against the INS and/or the United States, including those stated in the first amended complaint filed on September 23, 1997 in *Jama, et al. v. INS, et al.*, Civ. No. 97–3093(DRD) (D.N.J.) (The "lawsuit"), alleging, *inter alia*, tort liability for damage to property and for emotional damages, violations of United States obligations under various international treaties, and violations of the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb.

The language of the settlement agreement is unequivocal. The dispute arises. with respect to this settlement agreement and is specifically authorized by the Federal Tort Claims Act ("FTCA") 28 U.S.C. § 2672. That section provides:

The acceptance by the claimant of any such award, compromise, or settlement shall be final and conclusive on the claimant, and shall constitute a complete release of any claim against the United States and against the employee of the government whose act or omission gave rise to the claim, by reason of .the same subject matter.

The INS Officials argue that by virtue of the settlement agreement, § 2672 takes effect, and that once the plaintiffs have accepted payment through the settlement, they have given up *all* claims against the government and its employees, here the INS Officials. Plaintiffs argue that while § 2672 does exempt government employees, if acting in the scope of their employment, from further suit, this is merely a tort statute and therefore the non-tort claims included in the settlement agreement, which have no such provision, are still valid as against those employees. Consequently, plaintiffs contend that the INS Officials are still liable to plaintiffs on the subsequent non-tort claims (RFRA, international law, etc.). The language of both the settlement agreement and § 2672, shows that plaintiffs' argument is incorrect.

The FTCA is a jurisdictional statute permitting suit against the United States on a limited category of tort claims. Non-tort claims are covered by the settlement agreement. The fact that the settlement agreement includes tort claims triggers the application of § 2672. Once § 2672 has been implicated it applies to all claims that have arisen out of the "same subject matter." All claims are now barred as against the INS or its officials because they each arose out of the same conduct by the INS Officials and are by reason of the same subject matter.

Plaintiffs contend that the INS Officials are not entitled to the statutory immunity conferred by the FTCA by virtue of the Westfall Act.

Plaintiffs note 28 U.S.C. § 2679(b)(1) which provides that "[t]he remedy against the United States provided by sections 1346(b) and 2672 ... is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim ..." and that "[a]ny other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee ... is precluded without regard to when the act or omission occurred." Plaintiffs contend, however, that they are within one of the two exceptions to § 2679(b)(2)(B):

Paragraph (1) does not extend to or apply to a civil action against an employee of the Government–

(B) which is brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized.

Plaintiffs argues that their ATCA claims fall squarely within the statutory exception because they are brought for a violation of a statute, the Alien Tort Claims Act, under which an action against them is authorized. This argument fails because, as will be discussed in the next section of this opinion and in light of the Supreme Court's opinion in *Sosa v. Alvarez–Machain*, —— U.S. ——, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), plaintiffs cannot proceed under the ATCA against the INS Officials. Thus the exception contained in § 2679(b)(2)(B) is not applicable.

In light of the foregoing the motions of the INS Officials for summary judgment will be granted.

■ Esmor Facility Administrator Willard Stovall, joined by the other defendants, argues that all of the *Jama* plaintiffs' claims are barred by the dismissal and settlement of their FTCA claims against the United States. As set forth above, the claims against the INS Officials are barred by reason of that settlement. Stovall contends that he, and the other Esmor employees, were "employees of the government" and consequently, entitled to the same protection against further suit as that enjoyed by the INS Officials.

Stovall notes, accurately, that the settlement of plaintiffs' property claims pursuant to § 2672 of the FTCA, effects a "complete release" of "any claim" related to the settled claim against any employee of the Government. Stovall further notes that the FTCA, at § 2671 defines "employee of the government" in pertinent part as follows:

" 'Employee of the government' " includes officers or employees of any fed-eral agency ... and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation."

Section 2671 also provides in pertinent part:

"... 'Federal agency' includes the executive departments ... and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States."

It is Stovall's contention that under the circumstances of this case he must be deemed an "employee of the government" under the FTCA and thus entitled to the benefit of the bar against plaintiffs' remaining claims even though Esmor operated the Facility under a contract with the INS and Stovall was an Esmor employee.

To support his argument Stovall distinguishes the circumstances of this case from the circumstances in *Logue v. United States*, 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973), which held that county jail employees were employees of a contractor with the United States and could not be treated as employees of a federal agency. Logue, a federal prisoner, was housed in a county jail operated by the state that had contracted with the Federal Bureau of Prisons to provide for the safekeeping, care and subsistence of federal prisoners. The prison officers failed to provide the necessary means of preventing Logue from committing suicide. The Federal Bureau of Prisons had statutory authority to enter into such contracts, 18 U.S.C. § 4002.

The statute contemplated that the day-to-day operations of the contractor's facilities were to be in the hands of the contractor, with the government's role limited to the payment of sufficiently high rates to induce the contractor to do a good job.

The county undertook to provide custody in accordance with the Bureau of Prisons's rules and regulations governing the case and custody of persons committed under the contract. The contract reserved to the United States the right to enter the institution at reasonable hours for the purpose of inspecting it and determining the conditions under which federal offenders are housed. Absent federal control of the day-to-day activities of the prison, the Court held that for the purposes of the FTCA, the county employees were not employees of a federal agency.

The Court addressed the plaintiffs' alternative argument that even though the county employees might not be employees of a federal agency they might nevertheless be "acting on behalf of a Federal agency in an official capacity" thus making them an "employee of the government" under § 2671. The Court rejected this argument, stating:

> ■ The dissenting judges in the Court of Appeals expressed the view that "when the Government decides that a particular individual should assume obligations and responsibilities ·virtually identical to those of a salaried Federal employee, there may very well be some persuasive basis for the suggestion that such an individual's breach of a specific statutory duty owed by the salaried employee to a specific class of persons should visit identical liability upon the United States." [*Logue v. U.S.*,] 463 F.2d [1340] at 1342–1343 [(5th Cir. 1972)]. But we are not persuaded that employees of a contractor with the Government, whose physical performance is not subject to governmental supervision,

are to be treated as "acting on behalf of" a federal agency simply because they are performing tasks that would otherwise be performed by salaried employees of the Government. If this were to be the law, the exclusion of contractors from the definition of "Federal agency" in § 2671 would be virtually meaningless, since it would be a rare situation indeed in which an independent contractor with the Government would be performing tasks that would not otherwise be performed by salaried Government employees.

412 U.S. at 531–32, 93 S.Ct. 2215.

In the case of the INS, as distinguished from the Bureau of Prisons, there is no federal statute expressly authorizing it to contract with private companies to provide detention facilities for aliens. However, 8 U.S.C. § 1357(g)(1) permits the Attorney General to enter into a written agreement with "a State, or any political subdivision of a State" to carry out the functions of an immigration officer in relation to the investigation, apprehension, or detention of aliens. "In performing a function under this subsection, an officer or employee of a State or political subdivision of a State shall be subject to the direction and supervision of the Attorney General." 8 U.S.C. § 1357(g)(3).

Stovall relies upon the provision which reads: "Except as provided in paragraph (8) [13], an officer or employee of a State or political subdivision of a State performing functions under this subsection shall not be treated as a Federal employee for any purpose other than for purposes of chapter 81 of Title 5 (relating to compensation for injury) and sections 2671 through 2680 of

---

**13.** Paragraph 8 provides:

(8) An officer or employee of a State or political subdivision of a State acting under color of authority under this subsection, shall be considered to be acting under color

of Federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law.

Title 28 (relating to tort claims)." 8 U.S.C. § 1357(g)(7). Stovall argues that the incorporation of §§ 2671 through 2680 confers upon him and the other Esmor employees the benefits of § 2672, which provides that a settlement of claims against the INS pursuant to that section effects a complete release of any claim related to the settled claim against any employee of the government.

Stovall's reliance upon § 1357(g) is misplaced. It relates only to agreements between the Attorney General and "a State, or any political subdivision of a State." Esmor is not a state or a political subdivision of a state, and therefore these statutory provisions are not applicable in the instant case.

Returning to Stovall's contentions relying by negative implication upon *Logue*, it is true that the INS under its agreement with Esmor and in fact exercised far more involvement in the running of the Facility than the Bureau of Prisons exercised in *Logue*. The contract between the INS and Esmor contained detailed requirements concerning the operation of the Facility. These are described in the September 9, 2004 Opinion. The INS owned and/or controlled the Facility. It maintained several of its own personnel at the Facility on a daily basis, including a contracting officer technical representative ("COTR") who sought to ensure that Esmor complied with the contract. Stovall argues that "Esmor's employees were unquestionably 'subject to the direction and supervision of the Attorney General,' acting through the INS and its ever-present COFR." (Stovall Brief at 26). Stovall points to a number of instances when the INS intervened, raised questions or asked that specific procedures be changed or implemented.

There is evidence, however, from which it can be inferred that Esmor and its employees in fact ran the Facility. The INS report is evidence that the INS did not have effective control of the Facility. The report recites the failures of Esmor to comply with the contract, examples of which are set forth in the September 2004 Opinion. The INS's powers spelled out in the contract between the INS and Esmor were more extensive than the powers spelled out in the contract between the Bureau of Prisons and the county in the *Logue* case, and the INS used more personnel to monitor the contract relating to a Facility which held 300 inmates than the Bureau of Prisons used to monitor the Nueces County Jail. This does not lead to the conclusion that the Esmor employees were "employees of the government."

Although an "employee of the government" includes "persons acting on behalf of a federal agency in an official capacity," "federal agency" "does not include any contractor with the United States." § 2671. Esmor was clearly a contractor with the United States. Certainly at the summary judgment stage of this case the Esmor Officials cannot be held to be employees of the government insulated from liability by plaintiffs' settlement with the INS.

### Recent Legal Developments

A. *Sosa:* The Supreme Court's June 2004 opinion in *Sosa v. Alvarez–Machain,* —— U.S. ——, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), requires that this court's rulings in its 1998 Opinion concerning the ATCA be revisited. The revisiting will have significant effects upon the plaintiffs' substantive claims and upon statute of limitations issues.

The ATCA, 28 U.S.C. § 1350, provides "[t]hat the district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." To establish the law of

nations plaintiffs relied upon nineteen treaties, charters on human rights, conventions and other international instruments articulating the rights of refugees and seekers of asylum and condemning or prohibiting in general or specific terms many of the kinds of abuses which are alleged in the complaint.

None of those treaties or other international instruments are self-executing, and plaintiffs recognize that they do not by themselves provide a basis for suit under the ATCA. Rather they were submitted to establish that the abuses plaintiffs suffered at the hands of the defendants violated customary international law as informed by various international human rights treaties and other international human rights instruments. The court held in the 1998 Opinion that the ATCA provides both jurisdiction and a cause of action for claims under customary international law. The Court also held that:

> For the purposes of the present motions, the allegations of the complaints must be accepted as true and all reasonable inferences favorable to plaintiffs must be drawn from them. When this is done, it is evident that the totality of the treatment to which plaintiffs were subjected violated customary international law as it is now established. A multitude of sources establishes this rule of international law, and the references below are by way of example only.

227 Supp. 2 at 206. *Sosa* requires that this court revise its legal rulings and employ a different method of analysis in determining if plaintiffs have produced evidence to support an ATCA claim against any of the remaining defendants.

In *Sosa* the Drug Enforcement Administration (DEA) came to believe that Humberto Alvarez–Machain (Alvarez), a Mexican physician had participated in the torture and execution of a DEA agent in

Mexico, for which he was indicted in the United States. Failing to obtain the cooperation of the Mexican government, the DEA hired Mexican nationals, including Jose Francisco Sosa, to abduct Alvarez from his house, hold him in a motel and then bring him by private plane to Texas, where federal officers arrested him. After trial for the torture and murder the court granted Alvarez's motion for a judgment of acquittal.

After his return to Mexico Alvarez instituted a suit under the Federal Tort Claims Act and the ATCA (referred to in *Sosa* as "ATS") against Sosa, six Mexicans, the United States and four DEA agents. Pertinent to the present case is Sosa's suit under the ATCA alleging a violation of the law of nations. After disposition in the district court, the Court of Appeals held that the ATCA not only provides federal courts with subject matter jurisdiction but also creates a cause of action for an alleged violation of the law of nations, relying upon what it called the "clear and universally recognized norm prohibiting arbitrary arrest and detention" to support the conclusion that Alvarez's arrest amounted to a tort in violation of international law.

The Supreme Court held that "the statute is in terms only jurisdictional," but rejected Sosa's and the government's argument that "the statute does no more than vest federal courts with jurisdiction, neither creating nor authorizing the courts to recognize any particular right of action without further congressional action." —— U.S. at ——, 124 S.Ct. at 2754. However, the Court emphasized that at the time of its enactment Congress intended that the ATCA provide jurisdiction to hear only three clearly defined and limited claims, namely offenses against ambassadors, violations of safe conduct and individual actions arising out of prize captures and

piracy, noting that "[t]he sparse contemporaneous cases and legal materials referring to the ATS tend to confirm both inferences, that some, but few, torts in violation of the law of nations were understood to be within the common law." *Id.* at 2759.

The Court observed that "it is correct, then, to assume that the First Congress understood that district courts would recognize private causes of action for certain torts in violation of the law of nations, though we have found no basis to suspect Congress had any examples in mind beyond these torts corresponding to Blackstone's three primary offenses: violation of safe conduct, infringement of the rights of ambassadors, and piracy." *Id.* at 2761. The Court assumed "that no development in the two centuries from the enactment of § 1350 to the birth of the modern line of cases beginning with *Filartiga v. Pena-Irala,* 630 F.2d 876 (CA 2 1980), has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law." *Id.*

Despite its holding that courts may add to the original violations of the law of nations that may be remedied in an ATCA proceeding, the Court warned that "there are good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind," stating:

> Accordingly, we think courts should require any claim based on the present day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th century paradigms we have recognized. This requirement is fatal to Alvarez's claim.

*Id.* The door to further independent judicial recognition of actionable international norms "is still ajar subject to vigilant doorkeeping, and thus open to a narrow class of international norms today." *Id.* at 2764.

Informative in the instant case is the manner in which the Supreme Court determined whether the claim that Alvarez advanced could pass through the door and qualify as a claim subject to ATCA jurisdiction. His claim was that he was wrongfully abducted from his home in Mexico, held prisoner in a motel and then brought to the United States to face trial on a charge of torture and murder. Initially the Court observed "we are persuaded that federal courts should not recognize private claims under federal common law for violations of any international law norms with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted." *Id.* at 2765.

> Thus, Alvarez's detention claim must be gauged against the current state of international law, looking to those sources we have long, albeit cautiously, recognized.
>
> "[W]here there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is." *The Paquete Habana,* 175 U.S., 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900).

*Id.* at 2766–67.

To support his claim Alvarez cited the Universal Declaration of Human Rights and the International Covenant on Civil

and Political Rights which obligate the parties to them to refrain from arbitrary arrests. The Court noted the lack of binding effect of these and similar international undertakings and observed that Alvarez cites little authority that a broad rule prohibiting arbitrary detention has the status of a binding customary norm today. *Id.* at 2768.

Further, the Court observed that "the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, meritably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." *Id.* at 2766. In a footnote, the Court addressed the relevance of the availability of alternative remedies:

> This requirement of clear definition is not meant to be the only principle limiting the availability of relief in the federal courts for violations of customary international law, though it disposes of this case. For example, the European Commission argues as *amicus curiae* that basic principles of international law require that before asserting a claim in a foreign forum, the claimant must have exhausted any remedies available in the domestic legal system, and perhaps in other fora such as international claims tribunals. See Brief for European Commission as *Amicus Curiae* 24, n. 54 (citing I. Brownie, Principles of Public International Law 472–481 (6th ed.2003)); c.f. Torture Victim Protection Act of 1991, § 2(b), 106 Stat. 73 (exhaustion requirement). We would certainly consider this requirement in an appropriate case.

*Id.* at 2766, ftn 21.

■ The plaintiffs in the instant case assert ATCA claims against Esmor, against Esmor Officers, and against individual Esmor Guards. The overall claim against Esmor and the Esmor Officers is their maintenance of a detention facility and the condoning of conduct within that facility that violated clearly established principles of international law. The claims against the Esmor Guards vary from guard to guard. Some are alleged to have committed indecent sexual acts against the inmates, such as touching an inmate's penis while making a night time inspection or observing the inmate showering. Some are alleged to have robbed a plaintiff of money or stolen other property. Some have been charged with using racial epithets against the inmate. Some have been alleged to have used violence against an inmate.

In support of their contention that the actions of the Esmor defendants violated customary international law plaintiffs cited a plethora of international instruments, including the Universal Declaration of Human Rights and two treaties ratified by the United States—the International Covenant on Civil and Political Rights and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment. In the court's October 1998 Opinion denying defendants' motion to dismiss, the court stated that "it is evident that the totality of the treatment to which plaintiffs were subjected violated customary international law as it is now established." 22 F.Supp.2d at 363.

■ This conclusion must be modified in light of the kind of analysis that *Sosa* mandates. The conduct of each Esmor Guard will be described in a subsequent section of this opinion. A federal court applying the ATCA "should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms when § 1350 was enacted." *Id* at 2765. None of the claims against the

individual Esmor Guards can meet the rigorous *Sosa* requirements. Compare the conduct in which each individual Esmor Guards is alleged to have engaged with the torture and murder which was the subject of *Filartiga v. Pena–Irala, supra.* Summary judgment will be granted in favor of the Esmor Guards on plaintiffs' ATCA claims.

■ Esmor is, of course, responsible for the conditions in the Facility and, by virtue of the doctrine of respondeat superior, for the actions of the guards and its other employees on duty there. In *Sosa* the Court warned that the rule Alvarez urged "would support a cause of action in federal court for any event, anywhere in the world, unauthorized by the law of the jurisdiction in which it took place, and would create a cause of action for any seizure of an alien in violation of the Fourth Amendment, supplanting the actions under Rev. Stat. § 1979, 42 U.S.C. § 1983 and *Bivens v. Six Unknown Fed. Narcotics Agents* [citation omitted]" *Id.* at 2768.

The same danger might prevail if this were an action by prison inmates challenging the conditions of confinement. There is a large number of this kind of action throughout the United States. Any prison in which an alien was included among the inmates would face an ATCA case, even though the inmates would have available claims under 42 U.S.C. § 1983 or *Bivens.*

The present case is different. It involves the alleged gross mistreatment, not of criminals or persons accused of crime, but rather of persons who have committed no crime but are awaiting a decision on their applications for asylum. The law of nations as evidenced in the various conventions, treaties, declarations and other sources cited by the *Jama* plaintiffs can be said to have reached a consensus that the inhumane treatment of a huge number of persons accused of no crime and held in confinement is a violation of the law of nations. Further, the remedies available to those who are held in penal institutions may not be available to detainees such as the plaintiffs in the instant case. Because state action is not involved 42 U.S.C. § 1983 is unavailable. As will be discussed below, under *Malesko,* a Bivens action is not available. Even if a *Bivens* action were available, all but one of the plaintiffs (Jeffrey) are excludable aliens. They are deemed not to have entered the country and may not be entitled to the full panoply of constitutional rights. *Chi Thon Ngo v. INS,* 192 F.3d 390, 396 (3d Cir. 1999).

For those reasons the court concludes that there is evidence on the basis of which the *Jama* plaintiffs could establish an ATCA claim against Esmor and the Esmor Officers. Thus the motions of Esmor and the Esmor Officers for summary judgment on the ATCA claims will be denied.

**B. *Malesko*:** In addition to suing Esmor, the Esmor Officers and the Esmor Guards under the ATCA, the plaintiffs charged that these defendants violated their constitutional rights and were liable under *Bivens v. Six Unknown Federal Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The Supreme Court, in the case of *Correctional Serv. Corp. v. Malesko,* 534 U.S. 61, 122 S.Ct. 515 (2001), held that the implied damages action recognized in *Bivens* should not be extended to allow recovery against a private corporation operating a halfway house under contract with the Bureau of Prisons. All the parties agree that this decision bars plaintiffs' *Bivens* claims against Esmor. In *Malesko* the Court noted that "the question whether a *Bivens* action might lie against a private individual is not presented here," 53 U.S. at 65. That question remains in the present case, however, and it must be determined whether plaintiffs can maintain a *Bivens* action against the

individual defendants, namely, the Esmor Officers Stovall, Staley, Slattery, Speisman and Lima, and the Esmor Guards.

After *Bivens* recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights, the doctrine has been applied in a number of cases. Two criteria have surfaced in these cases: i) a right of action may be inferred because the plaintiff lacked any other remedy for the alleged constitutional deprivation, *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) and ii) a *Bivens* action may be sustainable even when there is an alternative remedy when the alternative remedy is insufficient to deter the unconstitutional acts of individuals. *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980).

It is evident that the Supreme Court applies *Bivens* relief with caution. In *Malesko* it noted that "[s]ince *Carlson* we have consistently refused to extend *Bivens* liability to any new context or new category of defendants." 534 U.S. at 68, 122 S.Ct. 515. Denying that Malesko had a *Bivens* claim against Correctional Services Corporation, the Court stated:

> In sum, respondent is not a plaintiff in search of a remedy as in *Bivens* and *Davis.* Nor does he seek a cause of action against an individual officer, otherwise lacking, as in *Carlson.* Respondent instead seeks a marked extension of *Bivens,* to contexts that would not advance *Bivens'* core purpose of deterring individual officers from engaging in unconstitutional wrongdoing. The caution toward extending *Bivens* remedies into any new context, a caution consistently and repeatedly recognized for three decades, forecloses such an extension here.

534 U.S. at 74, 122 S.Ct. 515.

■ Turning to the Esmor Officers and Esmor Guards, it is to be noted that although they were not federal officers, they were federal actors because they were employees of a corporation performing governmental functions pursuant to a contract with the INS under which the INS monitored the performance of the corporation and its employees. It must be determined whether *Malesko* bars a *Bivens* action against them.

A recent district court case, *Sarro v. Cornell Corr., Inc.,* 248 F.Supp.2d 52 (D.R.I.2003), contains a thoughtful discussion of this question. In that case plaintiff, a federal detainee in a privately operated detention center sued certain employees for money damages, claiming violations of his Fifth and Eighth Amendment rights when guards allegedly failed to protect him from attack by fellow inmates and failed to provide him with adequate medical treatment. The complaint included a *Bivens* claim.

The district court held that the defendants were federal actors, performing public functions. It found no manifestation of a Congressional intent to preclude courts from awarding damages to prisoners at privately-operated prisons for violations of their constitutional rights. It found no significant factors counseling hesitation in applying *Bivens.*

Addressing *Malesko,* the district court noted that recognizing plaintiff's damages claim furthered the "core premise" of deterring individual defendants from committing constitutional violations. Referring to the availability of state law remedies the court observed that "making the federal remedies available to a federal prisoner at a privately-operated institution contingent upon whether there are adequate alternative state law remedies would require a case-by-case analysis of state law and would cause the availability of a *Bivens*

remedy to vary according to the state in which the institution is located, a result that *Bivens,* itself sought to avoid." 248 F.Supp.2d at 63.

An important consideration in *Malesko* in reaching a determination of the availability of a *Bivens* remedy was whether such a remedy was needed to deter violations of federal constitutional rights. Applying that criteria in the present case, little deterrent effect would be achieved by allowing a *Bivens* action against the Esmor Officers. They are closely tied to the corporation itself, almost its alter ego. They are (with one exception) represented by the same counsel and undoubtedly any judgment against them would be picked up by Esmor. To permit a *Bivens* claim against the Esmor Officers would constitute an evasion of *Malesko* which prevents a *Bivens* action against Esmor.

█ A *Bivens* against the Esmor Guards, on the other hand, would have a deterrent effect. There is no assurance that Esmor would make good any money damages against them, and, in fact, might theoretically have a claim against them for the damages which their conduct caused Esmor should Esmor be held liable to the plaintiffs. Thus, applying the reasoning of the *Sarro* case, the court concludes that the plaintiffs may assert a *Bivens* claim against the Esmor Guards. As the following discussion of the statute of limitations will suggest, this conclusion may provide little assistance to the plaintiffs.

C. **Statute of Limitations**: The Esmor facility was in operation from August 1994 to July 1995. On June 17–18, 1995 the detainees rioted and were transferred elsewhere. Thus actions upon which plaintiffs rely to establish liability on the part of defendants must have occurred on or prior to June 18, 1995. The *Jama* plaintiffs filed their complaint in this court on June 16, 1997.

█ The New Jersey statute of limitations period for tort claims for personal injury is two years, N.J.S.A. 2A:14–2. *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 152, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) established the general rule with regard to federal statutes that lack a specific statute of limitations period "that Congress intended that the courts apply the most closely analogous statute of limitations under state law." In the present case, with the exception of any ATCA claim or any RFRA claim, each claim is subject to the two year statute of limitations.

The *Jama* plaintiffs obviously confront statute of limitations problems with respect to their federal and state law claims, with the two exceptions noted. Plaintiffs rely upon two legal theories to avoid what would otherwise be a statute of limitations defense.

█ First, plaintiffs rely on the filing date of the *Brown* Action complaint— March 6, 1996. It is well settled that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class ..." *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 554, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). Commencement of a class action tolls the statute of limitations for all putative class members, even those who seek to file separate lawsuits rather than join the class. *Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 353–54, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983). The *Jama* plaintiffs fall within the definition of the *Brown* class and therefore can take advantage of the *Brown* Action filing date with a notable exception.

The original defendants in the *Brown* Action were Esmor and two of its officers, James Slattery and Aaron Speisman. The two individuals were never served with the

complaint and were later dismissed with prejudice. As stated in *McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.,* 295 F.3d 380, 384–85 (3d Cir.2002):

> ... the Court in *American Pipe [& Construction Company v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974)]* held that the tolling rule is consistent with the twin functions of statutes of limitation—providing defendants with timely notice and avoiding stale claims—*because the action is tolled only by timely service of the class complaint on the defendants by the named plaintiffs.* (emphasis added).

Thus the filing of the complaint in the *Brown* Action tolled the statute of limitations only as to Esmor, because it was the only defendant in the *Jama* Action which was served in the *Brown* Action. The statute of limitations has not been tolled with respect to the Esmor Officers and the Esmor Guards.

■ Next plaintiffs seek application of the continuing violation doctrine. They allege constitutional and state law claims for an ongoing pattern and practice of abuses and degrading conditions that did not end until they were removed from the facility. Federal and state courts recognize that when a pattern or practice of illegal behavior results in a continuing violation of a plaintiff's rights, the statute of limitations is deemed to begin running only with the conclusion of the pattern of harmful conduct, i.e., when the last wrongful event occurs, e.g., *West v. Philadelphia Elec. Co.,* 45 F.3d 744, 754–55 (3d Cir. 1995). There is evidence that would support a finding that the conditions and conduct which is the subject of the *Jama* complaint continued until June 17–18, 1995. Thus the continuing violation principle might well be found to be applicable to the charges directed to Esmor, because it was responsible for all that went on at the

Facility while it was in operation. The principle might well be found to be applicable to the Esmor Officials. As to the Esmor Guards, however, they are charged with discrete acts, such as a beating, a theft, a sexual approach. Each of these events will have to be examined to determine if it was a continuing practice extending into the limitation period or if it was simply an event or series of events that ended outside the limitation period.

Finally plaintiffs seek to avoid the effect of the statute of limitations by application of principles of equitable tolling, e.g., *Rotella v. Wood,* 528 U.S. 549, 560, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). The record does not support application of equitable tolling. Although the record suggests that Esmor made it more difficult than it should have been for detainees to communicate with their lawyers, it is evident that a number of the detainees did in fact manage to communicate with their lawyers while they were at the Facility.

Jama's lawyer wrote complaints regarding her treatment at the Facility. He sent a written complaint about the food dated September 2, 1994. Bakar met with a lawyer while in the Facility. He consulted with counsel in Lehigh after his transfer (Bakar 128). Attorney Joyce Phipps (in her deposition) talks about having represented Yower, Nanteza and Jeffrey (probably before and after the riot)—complaining about access and their communicating with clients after they were sent to the York facility. Serwaa also appear to have had representation. Her lawyer was at one point turned away by mistake and then admitted pursuant to a Stovall memo (P1 Esmor Facts para 44).

The *Brown* Action plaintiffs managed to file their action in a timely manner.

The *Jama* Action plaintiffs' present counsel, Ms. Venetis, submitted a supple-

mental declaration (dated July 8, 2004) which recounts difficulties she had maintaining contact with some of the plaintiffs after they had been removed from the Facility. But even this declaration does not show that counsel were totally prevented for any significant period from contacting any of the plaintiffs. Ms. Venetis's emphasizes that she had no contact with plaintiffs prior to the riot, but the record establishes that plaintiffs could have, and many in fact did have, communication with other lawyers.

The record does not support a basis for a claim of equitable tolling.

Two other statutes of limitations are applicable in this case. RFRA has a statutory four-year statute of limitations. That leaves only the question of the statute of limitations to be applied to any surviving ATCA claims.

■ While the ATCA provides a course of redress for aliens who have been the subject of tortious conduct committed in violation of the law of nations, it fails to establish a statute of limitations period within which such a claim must be brought. Since its inception, this question has plagued lawmakers, and has become particularly difficult to answer in the last half century with the passage of other closely analogous statutes.

*DelCostello v. International Brotherhood of Teamsters, supra,* established the general rule with regard to federal statutes that lack a specific statute of limitations provision, namely, the most closely analogous statute of limitations under state law.

The New Jersey statute of limitations period for tort claims for personal injury is two years. N.J.S.A. 2A:14–2. If that statute were applied, claims brought under the ATCA would be two years. This was the rule when analyzing ATCA cases until about 1991. *See e.g., Hanoch Tel–Oren v. Libyan Arab Republic,* 517 F.Supp. 542, 550 (D.D.C.1981); *Von Dardel v. Union of Soviet Socialist Republics,* 623 F.Supp. 246, 258 (D.D.C.1985)

The Torture Victim Protection Act ("TVPA") was passed in 1992. Pub.L. No. 102–256, 106 Stat. 73 (1992). It's purpose was to "carry out obligations of the United States under the United Nations Charter and other international agreements pertaining to the protection of human rights by establishing a civil action for recovery of damages from an individual who engages in torture or extrajudicial killing." *Id.* Section (2)(c) of the Act establishes a 10 year statute of limitations period. *Id.* This statute is closely analogous to the ATCA as it provides protection to aliens suffering from torture, which is a violation of international law, creating a cause of action in United States federal court in which they can seek redress. As a result of the close relationship between the two statutes, courts began to look to the TVPA to provide the statute of limitations for the ATCA. *See Papa v. U.S.,* 281 F.3d 1004 (9th Cir.2002); *In re African–American Slave Descendants Litigation,* 304 F.Supp.2d 1027, 1069 (N.D.Ill.2004). It was determined that, although originally applying the state limitation period, doing so eroded the purpose of the ATCA, making it more difficult for a claimant to bring his action. Consequently, with the TVPA's passage, an exception to the *DelCostello* rule was met, and looking to the period established by the most closely related federal statute became the appropriate approach. In the case at bar, all parties agree that up until recently the ATCA has been governed by the 10 year statute of limitations period outlined in the TVPA. Indeed, almost all cases decided since the passage of the TVPA in 1991 have held its statute of limitations applicable to ATCA

claims. *See Papa,* 281 F.3d at 1004; *In re African–American,* 304 F.Supp.2d at 1069.

Recently the debate has resumed in light of the Supreme Court's opinion in *Sosa v. Alvarez–Machain,* —— U.S. ——, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).

The defendants in the instant case argue that the Supreme Court's ruling that the ATCA is a jurisdictional statute undermines the application of the TVPA's 10 year statute of limitations. According to the defendants, the claims brought under the ATCA were not for violations of the ATCA itself, but rather, were brought by way of the ATCA for violations of norms of international law or federal common law. Because of this difference and the fact that the violation is not of the ATCA itself, which was deemed to create no private cause of action, defendants argue that the TVPA is no longer the closely analogous statute. In effect, defendants urge resort to a pre-TVPA statute of limitations analysis of the ATCA as a result of *Sosa.*

Public policy suggests that "borrowing" the TVPA's 10 year statute of limitations period is still the correct way to go. Consequently, while *Sosa* does serve to limit the breadth of the claims eligible under the ATCA, that narrow reading does not influence the application of the TVPA 10 year statute of limitations.

The reason behind the courts' initial decision to change the ATCA's statute of limitations after the passing of the TVPA was to increase the fairness to the claimants trying to bring suit. As plaintiffs state in their brief, aliens bringing claims under the ATCA face greater obstacles than typical plaintiffs in tort suits and are therefore put at a disadvantage by such a short statute of limitations period as New Jersey's two year limit. Some of these hindrances are difficulties of gathering evidence sufficient to support a complaint; unavailability or hesitation of witnesses who may fear reprisal by a corrupt regime; other delays caused by ongoing human rights violations. Essentially, using the words of the Court in *DelCostello,* the use of a short statute of limitations period in this case would be "at odds with the purpose or operation of federal substantive law." 462 U.S. at 161, 103 S.Ct. 2281. "State legislatures do not devise their limitations periods with national interests in mind, and it is the duty of the federal courts to assure that the importation of state law will not frustrate or interfere with the implementation of national policies." *Id.* While it may be true that the causes of action do not stem from the ATCA itself, but rather from violations of international norms, the purpose behind the enactment of the ATCA would be furthered by applying the TVPA statute of limitations. This is a case where the "principles of federal equity are hostile to the 'mechanical rules' of statutes of limitations" provided by states. *Id.* at 162, 103 S.Ct. 2281.

For these reasons, the TVPA 10 year statute of limitations will be applied to the plaintiffs' claims under the ATCA.

■ **D.** *RFRA:* Plaintiffs claim Esmor, Esmor Officials and the Esmor guards burdened their exercise of religion while they were detained at the Esmor Facility in violation of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, *et seq.* Defendants contend they are entitled to judgment on Plaintiffs' RFRA claims for several reasons.[14]

---

**14.** Though both the INS officials and the Esmor Defendants make certain of the arguments discussed in this section, the INS officials make some arguments that the Esmor defendants do not, and vice versa. The court in this section refers to all of the arguments made by either set of the defendants as emanating from "Defendants" because it reads

**1. Constitutionality as applied to the federal government:** Defendants first argue that Plaintiffs' RFRA claims against them must fail as a matter of law because RFRA is unconstitutional (1) for the reasons explained in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) and (2) because it violates the Establishment Clause. For the reasons explained below, the court disagrees.

Congress passed RFRA in 1993. The statute provides, in pertinent part

(b) Government [15] may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb–1. Courts had applied the "strict scrutiny" standard enshrined in RFRA to claims for violation of the Free Exercise Clause of the First Amendment prior to the Supreme Court's decision in *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). *See, e.g., Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). In *Smith*, the Court rejected that standard, and held that neutral, generally applicable laws that incidentally burden religious practice pass muster under the Free Exercise Clause if they are merely rationally related to a legitimate governmental interest, i.e., they need not be the least restrictive means of furthering a compelling governmental interest to satisfy the Free Exercise Clause. *Smith*, 494 U.S. at 877–82, 110 S.Ct. 1595; *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 165 (3d Cir.2002). Congress enacted RFRA for the express purpose of restoring the pre-*Smith* "strict scrutiny" standard.[16]

Several years later, in *City of Boerne v. Flores*, the Supreme Court held that RFRA violated the constitution because, in enacting it, Congress had exceeded its remedial powers under section 5 of the Four-

---

each defendant brief as incorporative of the arguments that appear in the other defendants' briefs.

**15.** RFRA as enacted applied to both state and local governments, and to the federal government. 42 U.S.C. § 2000bb–2(1) (1993) (amended 2000).

**16.** 42 U.S.C.2000bb provides

**(a) Findings**
The Congress finds that—
(1) the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;
(2) laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;
(3) governments should not substantially burden religious exercise without compelling justification;

(4) in *Employment Division v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and
(5) the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

**(b) Purposes**
The purposes of this chapter are—
(1) to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and
(2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

teenth Amendment. *Boerne* involved a church's challenge to application of a local government's zoning regulation. The Court did not specify in its opinion whether it meant to invalidate RFRA only as applied to local and state governments (the application that was involved there), or whether it meant to invalidate the statute in its entirety (i.e., as applied to the federal government as well as state and local governments). Defendants argue that *Boerne* invalidated RFRA in its entirety.

The Court of Appeals has not squarely addressed this question. *See In re The Grand Jury Empaneling of the Special Grand Jury,* 171 F.3d 826, 829 (3d Cir. 1999) ("Here ... we need not decide whether any part of RFRA survives [*Boerne*], because we conclude that the federal government's actions in this case would survive constitutional scrutiny even under the rigorous RFRA standard"); *Adams v. Commissioner of Internal Revenue,* 170 F.3d 173, 175 (3d Cir.1999) ("For the purposes of this appeal, we assume without deciding that RFRA is constitu-

tional as applied to the federal government").

Every single other Circuit court that *has* squarely addressed the question, however, has held that *Boerne* did *not* invalidate RFRA in its entirety, and that the statute remains valid as applied to the federal government. *See O'Bryan v. Bureau of Prisons,* 349 F.3d 399, 400–401 (7th Cir.2003) (Easterbrook, J.); *Guam v. Guerrero,* 290 F.3d 1210, 1218–1221 (9th Cir.2002); *Henderson v. Kennedy,* 265 F.3d 1072, 1073 (D.C.Cir.2001); *Kikumura v. Hurley,* 242 F.3d 950, 958–960 (10th Cir.2001); *Christians v. Crystal Evangelical Free Church,* 141 F.3d 854 (8th Cir. 1998). These courts reasoned that *Boerne's* rationale for finding RFRA unconstitutional—that Congress exceeded its section 5 enforcement powers when it enacted the statute—has no relevance to the question of the statute's constitutionality as applied to the *federal* government. This is because Congress' ability to make laws applicable to the federal government does not stem from section 5;[17] that sec-

---

**17.** Congress's power to enact laws governing the conduct of the federal government must instead stem from one of its Article I enumerated powers. RFRA's legislative history indicates that Congress believed the Necessary & Proper Clause, U.S. Const. Art. I, § 8, cl. 18, authorized it to enact the portion of RFRA that applies to the federal government. H.R.Rep. No. 103–88, at 17 (1993) ("the Committee believes that Congress has the constitutional authority to enact [RFRA]. Pursuant to Section 5 of the Fourteenth Amendment and the Necessary and Proper Clause embodied in Article I, Section 8 of the Constitution, the legislative branch has been given authority to provide statutory protection for a constitutional value ..."). Several courts have since held that RFRA indeed is a proper exercise of the authority that Clause confers on Congress. *See, e.g., O'Bryan,* 349 F.3d at 401 (the Necessary and Proper Clause "permits Congress to determine how the national government will conduct its own affairs. No one doubts that the Bureau of Prisons itself could choose to

accommodate religious practices. By and large, what the Executive Branch may elect, the Legislative Branch may require. (It would not be tenable to argue that prison management is a subject constitutionally committed to the President to the exclusion of Congress)"). Some commentators, however, have asserted that it is not a proper exercise of that authority. *See, e.g.,* Marci A. Hamilton, *The Religious Freedom Restoration Act: Letting the Fox into the Henhouse Under Cover of Section 5 of the Fourteenth Amendment,* 16 CARDOZO L.REV. 357, 364 (1994) ("Of course, the Necessary and Proper Clause, despite its broad language, can provide no support for RFRA in the absence of a particular enumerated power. Its function is solely to permit Congress broad sway when it is acting under an enumerated power.").

Other courts have found that Congress derived its power to enact the portion of RFRA that applies to the federal government from the same source it derived the power to pass statutes that if challenged would be measured

tion authorizes Congress to pass legislation regulating the conduct of *states only.*

Defendants argue that *Boerne's* holding was based not only on the limitations on Congress's section 5 power, but also on the court's finding that RFRA, by providing more protection for the right to free exercise than the Court in *Smith* held was required, violates separation of powers principles. The presence of this second rationale, Defendants claim, makes the statute as unconstitutional as applied to the federal government as it is as applied to state governments.

There is indeed language in *Boerne* suggesting that in enacting RFRA Congress usurped the judiciary's power to interpret the constitution in violation of the separation of powers doctrine. Several courts and commentators have recognized, however, that this language is meaningless unless read within the context of the court's discussion of section 5 of the Fourteenth Amendment. *See, e.g., Guerrero,*

290 F.3d at 1219–20 ("[the *Boerne* court's] discussion of the separation of powers doctrine was entirely within the framework of its section 5 analysis—not an independent rationale"); *Kikumura,* 242 F.3d at 958–59 ("Although the court did mention separation of powers concerns in [*Boerne*], this language must be read in the context of the entire opinion and the question being considered"); Gregory P. Magarian, *How to Apply the Religious Freedom Restoration Act to Federal Law Without Violating the Constitution,* 99 MICH. L.REV. 1903, 1914 (2001) (recognizing that in *Boerne* "Justice Kennedy forcefully asserted the judicial prerogative to interpret the Constitution in language that might be understood to implicate [RFRA's] applications to federal as well as state law," but also that other language in the opinion indicates that the Court "situated [its] judicial supremacy concerns squarely in the context of the Fourteenth Amendment and state sovereignty").[18] For these reasons, the

---

by the standard RFRA creates. In other words, "because RFRA, in effect, amends all federal laws to provide enhanced protection for the free exercise of religion ... [the statute] reveals its enumerated powers basis only upon application in each particular case." *In re Hodge,* 220 B.R. 386, 398 (D.Idaho 1998). *See, e.g., Guerrero,* 290 F.3d at 1220–21 ("Congress derives its ability to protect the free exercise of religion from its plenary authority found in Article I of the Constitution; it can carve out a religious exemption from otherwise neutral, generally applicable laws based on its power to enact the underlying statute in the first place"); *Christians,* 141 F.3d at 860 (invoking Art. I, § 8 bankruptcy power to justify application of RFRA to the law of bankruptcy).

At least one commentator has suggested that Congress did not need to draw on *any* constitutional authority to enact the portion of RFRA that applies to the federal government because it did not exercise power—but rather renounced it—when it enacted RFRA. That is, when it passed RFRA Congress "ceded a measure of its own authority to the People." Gregory P. Magarian, *How to Apply*

*the Religious Freedom Restoration Act to Federal Law Without Violating the Constitution,* 99 MICH. L.REV. 1903, 1926 (2001).

Defendants argue only that under *Boerne* RFRA is unconstitutional as applied to the federal government. They do not argue that Congress lacked the constitutional authority to enact the portion of RFRA that applies to the federal government. The court thus need not ratify any one of the above theories.

18. RFRA does *not* violate the separation of powers doctrine merely because it affords more protection to the right to free exercise than does the Free Exercise Clause according to the *Smith* court's interpretation of it. As the Eighth Circuit noted in *Christians,*

While Congress cannot, through ordinary legislation, amend the Court's authoritative interpretation of the Constitution, "congressional disapproval of a Supreme Court decision does not impair the power of Congress to legislate a different result, as long as Congress had that power in the first place." *United States v. Marengo County Comm'n,* 731 F.2d 1546, 1562 (11th Cir.1984); *see*

court concludes that the *Boerne* court did not find RFRA unconstitutional as applied to the federal government, either on section 5 or separation of powers doctrine grounds.

Defendants assert that even if the court is not persuaded by its argument that *Boerne* invalidated RFRA as applied to the federal government, it must dismiss Plaintiffs' RFRA claims because the statute violates the Establishment Clause. In support of this argument, Defendants cite Justice Stevens' concurrence in *Boerne* in which he opined that RFRA violated the Establishment Clause because the statute "provided the Church with a legal weapon that no atheist or agnostic can obtain." *Boerne*, 521 U.S. at 537, 117 S.Ct. 2157 (Stevens, J., concurring).

The court notes initially the significant fact that the *Boerne* majority declined to adopt Justice Stevens' view of RFRA's

status under the Establishment Clause. Moreover, every Circuit court that has addressed the question has held that RFRA does not violate the Establishment Clause. *See Christians,* 141 F.3d at 861–63; *Mockaitis v. Harcleroad,* 104 F.3d 1522, 1530 (9th Cir.1997), *overruled on other grounds by Boerne; Sasnett v. Sullivan,* 91 F.3d 1018, 1022 (7th Cir.1996) (Posner, J.), *overruled on other grounds by Sullivan v. Sasnett,* 521 U.S. 1114, 117 S.Ct. 2502, 138 L.Ed.2d 1007 (1997); *EEOC v. Catholic Univ. of Am.,* 83 F.3d 455, 470 (D.C.Cir. 1996); *Flores v. City of Boerne,* 73 F.3d 1352, 1364 (5th Cir.1996), *rev'd on other grounds by Boerne,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

Defendants argue that Justice Stevens' concurrence has recently "found footing" in judicial interpretation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"),[19] citing *Cutter v. Wilkin-*

---

*also Flores,* 521 U.S. at 533–35, 117 S.Ct. at 2171 ("When Congress acts within its sphere of power and responsibilities, it has not just the right but the duty to make its own informed judgment on the meaning and force of the Constitution. This has been clear from the early days of the Republic."). Congress has often provided statutory protection of individual liberties that exceed the Supreme Court's interpretation of constitutional protection. *See, e.g.,* Privacy Protection Act of 1980, 42 U.S.C. §§ 2000aa to 2000aa–12 (reacting to *Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978), and providing journalists with greater protection against searches and seizures); National Defense Authorization Act for Fiscal Years 1988 and 1989, § 508, 10 U.S.C. § 774 (reacting to *Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986), and providing that members of military were entitled to wear religious headgear); *cf* Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) (reacting to *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), and equating employment discrimination based on pregnancy with employment discrimination based on gender).

Because Congress need not agree with everything the Supreme Court does in order for its legislation to pass constitutional muster, we conclude that RFRA is not contrary to the Constitution merely because Congress disagreed with the *Smith* Court's interpretation of the Free Exercise Clause. 141 F.3d at 860. *See also Guerrero,* 290 F.3d at 1221; *Kikumura,* 242 F.3d at 959.

**19.** Congress enacted RLUIPA in 2000 in response to *Boerne's* partial invalidation of RFRA. RLUIPA's provision relating to institutionalized persons imposes on state and local programs that receive federal financial assistance the obligations RFRA imposed on state and local governments before *Boerne* invalidated that statute as applied to them. 42 U.S.C. § 2000cc–1(a)–(b) (2000). To avoid the problems that led the *Boerne* court partially to invalidate RFRA, Congress relied on its Spending and Commerce Clause powers— rather than its remedial powers under section 5 of the Fourteenth Amendment—to enact RLUIPA. *See, e.g., Madison v. Riter,* 355 F.3d 310, 315 (4th Cir.2003).

Cases assessing the status of RLUIPA under the Establishment Clause are relevant to an examination of RFRA's status under that

*son*, 349 F.3d 257 (6th Cir.2003) in which the Sixth Circuit held that the provision of RLUIPA that applies to institutionalized persons violates the Establishment Clause. The *Cutter* court is not representative of courts that have assessed Establishment Clause challenges to RLUIPA, however; most of those courts (which include four Circuit courts and at least two district courts within the Third Circuit) have held that RLUIPA does *not* violate the Establishment Clause. *See Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1240–42 (11th Cir.2004); *Madison v. Riter*, 355 F.3d 310 (4th Cir.2003); *Charles v. Verhagen*, 348 F.3d 601, 610–11 (7th Cir. 2003); *Mayweathers v. Newland*, 314 F.3d 1062, 1068–69 (9th Cir.2002); *Congregation Kol Ami v. Abington Tp.*, No. Civ. A. 01–1919, 2004 WL 1837037, at *12–15 (E.D.Pa. Aug.17, 2004); *Williams v. Bitner*, 285 F.Supp.2d 593, 599–601 (M.D.Pa. 2003).

■■■ The court agrees with the weight of authority cited above that RFRA must survive an Establishment Clause challenge because (1) it has a secular legislative purpose, (2) its primary effect neither advances nor inhibits religion, and (3) it does not foster excessive government entanglement with religion, as these three requirements have been defined by the Supreme Court. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

■■■ **2. *Claims against individual defendants for money damages:*** Defen-

dants argue that even if RFRA is constitutional, Plaintiffs' claims under the statute against the Esmor officials and Esmor Guards must nevertheless fail because RFRA does not allow suits (1) against individuals (2) for money damages. The court disagrees. As explained more fully below, the plain language of RFRA indicates that Congress intended to create a cause of action against individuals as well as governmental entities. Plaintiffs may not use this cause of action to sue government officials in their official capacities for money damages because Congress did not waive sovereign immunity to such suits. However, based on RFRA's text and purpose and the way other courts have interpreted the statute, the court finds that under RFRA plaintiffs may sue individual officers in their individual capacities for money damages.

Defendants suggest that RFRA does not allow suits against individuals challenging wrongful conduct, but rather allows only for suits against governmental bodies challenging laws and regulations on their face. In support of this argument, Defendants cite the language of RFRA, which addresses itself to "government" rather than individuals, and focuses its prohibitions on "laws" and "rules" that government enacts rather than the conduct of individuals.

■■■ It is true that some of the statutory text arguably indicates that when it drafted RFRA, Congress had in mind governmental bodies rather than individuals,[20] and legislation rather than conduct.[21] Oth-

clause. *See Congregation Kol Ami v. Abington Tp.*, No. Civ.A. 01–1919, 2004 WL 1837037, at *13 n. 11 (E.D.Pa. Aug.17, 2004).

20. *See, e.g.*, 42 U.S.C. § 2000bb–1(a) (*"Government* shall not substantially burden a person's exercise of religion"), § 2000bb(b)(2) (one of RFRA's purposes is "to provide a claim or defense to persons whose religious exercise is substantially burdened *by government"*), § 2000bb–1(c) (plaintiffs may bring a claim under RFRA to "obtain appropriate relief against *a government"*) (all emphases added).

21. *See, e.g.*, 42 U.S.C. § 2000bb(a)(2) ("Congress finds that ... *laws* 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise"), § 2000bb–1(a) ("Government shall

er language in RFRA, however, clearly indicates that Congress intended the law to apply to individuals *as well as* governmental bodies, and conduct *as well as* legislation. For example, the definitions section of the statute defines "government" to include "a branch, department, agency, instrumentality, and *official* (or other *person* acting under color of law) of the United States, or of a covered entity." 42 U.S.C. § 2000bb–2(1) (2000) (emphases added). *See Mack v. O'Leary*, 80 F.3d 1175, 1177 (7th Cir.1996) *vacated on other grounds.*[22] Further, § 2000bb–3 makes clear that RFRA applies to conduct as well as laws and rules when it specifies that the statute applies to "all Federal law, *and the implementation of that law.*" (emphasis added).[23]

Defendants argue next that even if individuals are proper defendants under

RFRA, Plaintiffs' claims must fail because RFRA does not allow for the award of money damages. The section of RFRA that addresses remedies under the statute reads, in pertinent part, as follows:

**Judicial Relief.** A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.

42 U.S.C. § 2000bb–1(c) (1993). Defendants argue that an award of money damages against individual defendants is not "appropriate relief against a government."

Defendants had made this argument in their 1998 motion to dismiss. At that time, the court left the question open, noting

It is not at all certain that "appropriate relief against a government" was not

---

not substantially burden a person's exercise of religion even if the burden results from *a rule of general applicability*"), § 2000bb–3(a) ("This chapter applies to all Federal *law* ... whether adopted before or after November 16, 1998").

**22.** Not surprisingly, several courts have interpreted the counterpart language in RLUIPA (that is nearly identical to the RFRA language), 42 U.S.C. § 2000cc–5(4)(a), similarly to allow for suits against individual defendants. *See, e.g., Guru Nanak Sikh Society of Yuba City v. County of Sutter*, 326 F.Supp.2d 1128, 1136 (E.D.Cal.2003); *Orafan v. Goord*, No. 00CV2022, 2003 WL 21972735, at *9 (N.D.N.Y. Aug.11, 2003).

**23.** The court notes that the Esmor guards may be sued under RFRA not only despite the fact that they are individuals rather than government bodies, but also despite the fact that they are private actors rather than "officials of the government," because there is no question that the Esmor guards "acted under color of law." 42 U.S.C. § 2000bb–2(1).

Several courts have held that employees of private companies which operate correctional facilities "act under color of state law" *for § 1983 purposes* because they perform a function traditionally reserved to the state. *See,*

*e.g., Rosborough v. Management & Training Corporation.*, 350 F.3d 459 (5th Cir.2003) (corporation and its employees may be sued under § 1983); *Skelton v. Pri–Cor, Inc.*, 963 F.2d 100, 101–102 (6th Cir.1991) (corporation may be sued under § 1983); *Plain v. Flicker*, 645 F.Supp. 898, 907 (D.N.J.1986) ("if a state contracted with a private corporation to run its prisons it would no doubt subject the private prison employees to § 1983 suits under the public function doctrine"). The Supreme Court has not explicitly discussed and endorsed this holding, but has suggested its endorsement. *See, e.g., Correctional Services Corporation v. Malesko*, 534 U.S. 61, 71 n. 5, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) ("state prisoners ... enjoy a right of action against private correctional providers under 42 U.S.C. § 1983").

"When a legislature borrows an already judicially interpreted phrase from an old statute to use it in a new statute, it is presumed that the legislature intends to adopt not merely the old phrase but the judicial construction of that phrase." *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826, 834–35 (9th Cir.1999) (citing cases for the proposition that the judicial interpretation of the phrase "acting under color of law," as used in § 1983, applies equally in a RFRA action).

intended to include damages. The Act is relatively new; its construction and constitutionality are uncertain. In these circumstances the prudent course is to deny the motion to dismiss the RFRA claims without prejudice to a renewal of the motion at a time when more guidance concerning its intent may be available.

*Jama*, 22 F.Supp.2d at 370. Defendants here renew their claim; though little more guidance regarding Congress's intent is available now than was available in 1998, the court must now resolve the claim.

■■■ Defendants argue that money damages are not "appropriate relief" against a government" because, they claim, Congress did not waive sovereign immunity to damages suits under RFRA. It is well-settled that the federal government is immune from suit unless it has waived immunity. *See, e.g., Dept. of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999); *U.S. v. Bein*, 214 F.3d 408, 412 (3d Cir.2000). Sovereign immunity bars suits against federal government officials—as well as the United States itself—if those officials are sued in their official capacity.[24]

The Supreme Court has usually required that waivers of sovereign immunity be "unequivocally expressed in statutory text,"[25] and that they "extend *unambiguously* to ... monetary claims" if they are to allow such claims. *Lane v. Peña*, 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996); *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33–34 & 37, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (emphasis added). The court agrees with Defendants and several other district courts that § 2000bb–1(c)'s reference to "appropriate relief" "is not the kind of unambiguous waiver necessary to subject the United States to liability for damages." *Tinsley v. Pittari*, 952 F.Supp. 384, 389 (N.D.Texas 1996). *See also, e.g., Meyer v. Federal Bureau of Prisons*, 929 F.Supp. 10, 13–14 (D.D.C.1996) (holding that "RFRA provides no waiver of governmental immunity ... As a result, the plaintiff has failed to state a claim under which he can recover the monetary damages he seeks").

■■■ That Congress did not waive sovereign immunity for damages suits does not necessarily mean that Plaintiffs may not collect damages from the individual defendants, however. As noted, sovereign immunity protects government officials sued in their official capacity only. Federal officials sued in their *individual* capacities are not immune from suit. *See, e.g.,*

---

**24.** A suit filed against a federal official in his or her official capacity is actually a suit against the United States. In determining whether a suit against a government official is an official capacity suit or an individual capacity suit, "the dispositive inquiry is 'who will pay the judgment?'" *Stafford v. Briggs*, 444 U.S. 527, 542 n. 10, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980); *Hines v. SSA*, No. 95–1342, 1996 WL 426822, at *3 (D.N.J. Jan.23, 1996). If the individual defendant will be responsible for paying damages awarded against him, it is an individual capacity suit. If damages will be paid out of the Federal Treasury, it is an official capacity suit.

It is the Esmor defendants and not the INS officials who advance most vigorously the argument that money damages are not available under RFRA because the government has not waived sovereign immunity. This is ironic as, because the Esmor defendants are not officials of the government, they have no "official capacity" and would not be protected by sovereign immunity, so the fact that the government has not waived such immunity is irrelevant to them.

**25.** A majority of the Court recently indicated, however, that it may be permissible to find support for a waiver of sovereign immunity not only in statutory language, but also in statutory purpose and history. *West v. Gibson*, 527 U.S. 212, 119 S.Ct. 1906, 144 L.Ed.2d 196 (1999).

*Larson v. Domestic & Foreign Commerce Corporation*, 337 U.S. 682, 686–87 & 689–90, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); *State of Fla., Dept. of Business Regulation v. U.S. Dept. of Interior*, 768 F.2d 1248, 1251–52 (11th Cir.1985); *Sanchez–Espinoza v. Reagan*, 770 F.2d 202, 207 (D.C.Cir. 1985); *Gilbert v. DaGrossa*, 756 F.2d 1455, 1459 (9th Cir.1985); 14 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3655. Plaintiffs clarified in their Opposition Brief that they bring their RFRA claims seeking money damages from defendants in their *individual* capacities only.

The court reads RFRA to allow for individual capacity suits (as opposed to official capacity suits) against individual defendants. The mere fact that § 2000bb–2(1) provides that people who are not government officials ("and other person acting under color of law") are "government," and thus proper defendants under RFRA, indicates that individual capacity suits must be permitted because no one who is not a government official has an "official capacity" in which to be sued. Moreover, Congress knows how to specify that a statutory provision applies to government officials only in their "official capacity" when it wants to, and has not done so here. *See, e.g.*, 28 U.S.C. § 1391(e), which provides, in part, "[a] civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity ... may ... be brought in any judicial district," *and Stafford v. Briggs*, 444 U.S. 527, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980) (holding, based in part on this statutory language, that § 1391(e) is not applicable to actions for money dam-

ages brought against federal officials in their individual capacities.").

The court also reads RFRA to allow for individual capacity suits for money damages specifically (as opposed to for injunctive relief only). It arrives at this reading for several reasons.

First, while § 2000bb–1(c) does not explicitly permit individual capacity suits for money damages, it does not explicitly preclude them, either. It is by no means evident that because Congress did not expressly state that money damages are available in that section, "appropriate relief against a government" does not include money damages. Indeed, as another district court has noted, "it is at least as likely that Congress" [intended with the phrase "appropriate relief" to] exclude any action against a [government] directly ... [but to include] an action for damages against [government] officials acting in their individual capacities." *Commack Self–Service Kosher Meats Inc. v. State of N.Y.*, 954 F.Supp. 65, 69 (E.D.N.Y.1997).

Second, a conclusion that RFRA does not allow for suits for money damages would seem to be at odds with the general Congressional purpose that animates the statute. Congress enacted RFRA because it wanted to re-invigorate protection of free exercise rights after the Supreme Court in *Smith* diluted the standard used to evaluate claimed violations of those rights. 42 U.S.C. § 2000bb(a) & (b); *Boerne*, 521 U.S. at 512–16, 117 S.Ct. 2157. Courts have always recognized § 1983 and Bivens claims for money damages against officials for violation of the Free Exercise Clause. *See, e.g., Sutton v. Rasheed*, 323 F.3d 236, 249 & 258 n. 38 (3d Cir.2003) (§ 1983); *Jihaad v. O'Brien*, 645 F.2d 556 (6th Cir.1981) (Bivens).[26] It seems unlike-

---

**26.** That courts often find that the defendant is entitled to qualified immunity in these suits for damages does not diminish their status as authority for the proposition that plaintiffs

may seek money damages against those who have allegedly violated their rights under the Free Exercise Clause.

ly that Congress would *restrict the kind of remedies* available to plaintiffs who challenge free exercise violations in the same statute it passed to *elevate the kind of scrutiny* to which such challenges would be entitled. The statute's legislative history appears to confirm this view. *See* S.Rep. No. 103–111, pt. V(f), at 1902, U.S.Code Cong. & Admin.News `1993, pp. 1892, 1902 ("the act does not expand, contract or alter the ability of a claimant to obtain relief in a manner consistent with the Supreme Court's free exercise jurisprudence under the compelling governmental interest test prior to *Smith*").

Third, while no other court has explicitly theorized *why* money damages are available under RFRA, or held explicitly that they are, courts have considered (thus assuming the availability of) individual capacity claims for damages under the statute. While these courts have not *granted* damages in any of these cases, their denials of the claims for damages have been based on the merits of the claims or the defendants' entitlement to qualified immunity rather than a finding that damages are unavailable under the statute. *See, e.g., Mack,* 80 F.3d at 1177 (stating that defendants "do not question the propriety of damages as a remedy for violations of [RFRA], even though [RFRA] says nothing about remedies except that a person whose rights under the Act are violated 'may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief

against a government, and then proceeding to evaluate the merits of plaintiff's RFRA claim for damages' "); *Malik v. Kindt,* 107 F.3d 21 (10th Cir.1997); *Winburn v. Bologna,* 979 F.Supp. 531, 535 (W.D.Mich. 1997); *Gilmore–Bey v. Coughlin,* 929 F.Supp. 146, 151 (S.D.N.Y.1996); *Rust v. Clarke,* 851 F.Supp. 377, 381 (D.Neb. 1994).[27] *See also Brown v. Hot, Sexy & Safer Productions,* 68 F.3d 525, 537–38 (1st Cir.1995) (assuming the availability of damages under RFRA in coming to its conclusion that the statute does not create a *retroactive* cause of action for such damages).[28]

Congress has amended RFRA since these cases were decided;[29] that amendment gave Congress an opportunity to change statutory language and clarify that damages were not available under RFRA, but, significantly, Congress did not do this.

Plaintiffs argue that money damages are available also because of the well-settled common law principle that "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 70–71, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). *See also Nextel Partners Inc. v. Kingston Tp.,* 286 F.3d 687, 695 n. 6 (3d Cir.2002) ("when a statute creates a private right of action but does not specify what remedies are available, the availability of all appro-

---

**27.** Moreover, several courts have interpreted language in RLUIPA (that is nearly identical to the language of § 2000bb–1(c)) to allow for suits against individual defendants for damages. *See, e.g., Orafan v. Goord,* No. 00CV2022, 2003 WL 21972735, at *9 (N.D.N.Y. Aug.11, 2003); *Charles v. Verhagen,* 220 F.Supp.2d 937, 953 (W.D.Wis.2002).

**28.** The fact that several of these cases involved RFRA claims against state officials that would not be allowed post-*Boerne* does not

render them unpersuasive on the question of the availability of money damages under RFRA.

**29.** In 2000, Congress amended § 2000bb–2(1)—the provision defining "government" for the purposes of RFRA—to reflect *Boerne's* invalidation of the statute as applied to state and local governments. The amendment, *inter alia,* struck "a State, or a subdivision of a State" from that section.

priate remedies is generally presumed"). The court disagrees that this principle applies here because RFRA is not a statute in which Congress was "silent" on the question of remedies. *See Landgraf v. USI Film Products*, 511 U.S. 244, 276, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *Snapp v. Unlimited Concepts, Inc.*, 208 F.3d 928, 937 (11th Cir.2000). While Congress was not as explicit as it might have been in § 2000bb–1(c) about specifically what kind of relief is available under RFRA, it did include a limiting principle: "appropriate relief against a government." Congress clearly stated that relief that is not appropriate against a government is not available under RFRA. It was therefore not "silent" on the issue of damages, and the *Franklin* presumption is consequently inapplicable.[30]

For the foregoing reasons, the court holds that Plaintiffs' individual capacity RFRA claim against the Esmor Guards for money damages may stand.

■ Neither the text nor the legislative history of RFRA indicates that Congress intended in that statute to abrogate the qualified immunity to which executive officials were entitled under common law. The court thus finds that the defense would have been available to the INS officials under RFRA had they remained parties to this action. However, the defense of qualified immunity is *not* available to the Esmor guards, because they are not executive officials. *Richardson v. McKnight*, 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997) (holding that prison guards who are employees of a private prison management firm are not entitled to a qualified immunity from suit brought by prisoners under § 1983).

■ For reasons similar to those discussed above, the court finds that Esmor is a proper defendant for Plaintiffs' RFRA claims and that money damages may be awarded against it. Esmor is a proper defendant for the same reasons courts have found private companies which operate correctional facilities to be proper defendants for § 1983 claims. *See* note 10. The court may order Esmor to pay money damages if it finds Esmor has burdened Plaintiffs' religious exercise for two reasons: (1) Esmor is not immune from suit for damages because it is not entitled to government contractor immunity for the reasons explained in this court's earlier opinion, *Hawa Abdi Jama v. I.N.S., et al.*, 334 F.Supp.2d 662 (D.N.J.2004), and (2) money damages are appropriate relief under RFRA for all the reasons discussed in the preceding section.

### Discussion

**A. Issues Determined in the 2004 *Brown* Opinion**: On September 9, 2004 the court issued the 2004 *Brown* Opinion which addressed, among other things, Esmor's motion for summary judgment in the *Brown* Action. Many of the issues disposed of in that opinion are raised in Esmor's and the other defendants' motions for summary judgment in the *Jama* Ac-

---

**30.** Contrary to Defendants' contention, if the *Franklin* presumption *did* apply, and the court could award whatever relief was appropriate, money damages would be the only appropriate relief in this case. This is because, as none of the Plaintiffs remain in custody and the Esmor facility has closed, injunctive and declaratory relief clearly would be inadequate for Plaintiffs. *See Franklin*, 503 U.S. at 76, 112 S.Ct. 1028 (finding that injunctive relief would be inadequate for a student plaintiff who sued her teacher for sexual harassment because she was no longer a student and the teacher no longer taught at the school, and that therefore money damages were the appropriate form of relief). Nevertheless, because the *Franklin* presumption does not apply, the court has had to look elsewhere for an indication of what relief is available under RFRA.

tion. These issues will be resolved in the same manner insofar as they are pertinent to the *Jama* Action motions. There follows a recital of these legal rulings.

The INS Interim Report is admissible evidence. It provides evidence upon which the *Jama* plaintiffs may rely in support of their various claims.

 The *Jama* Action plaintiffs, like the *Brown* Action class plaintiffs have alleged that under New Jersey law Esmor was negligent in hiring, retention, training and supervision of its employees. As stated in the 2004 *Brown* Opinion, "there is ample evidence in the record to support Plaintiffs' negligence claims." For this reason Esmor's motion to dismiss the *Jama* plaintiffs' negligence claims must be denied.

The 2004 *Brown* Opinion rejected Esmor's defense that it is immune from liability for any negligence in its hiring, retention, training or supervision because its policies and practices in these areas were specifically approved by the government. The court held that at least at the summary judgment stage Esmor could not avail itself of the government contractor defense. Similarly at the summary judgment stage Esmor cannot avail itself of that defense against the *Jama* Action plaintiffs' claims.

The 2004 *Brown* Opinion also ruled that "[b]ecause Plaintiffs claim of intentional wrongdoing is redundant, and because they have not argued that it is appropriately viewed as a cause of action distinct from their negligence claim, Esmor's motion for summary judgment will be granted as to that claim." Because the claims of the *Jama* Action plaintiffs go well beyond the claims of the *Brown* Action plaintiffs this ruling will not have blanket application to the claims of the *Jama* plaintiffs.

 The 2004 Opinion found that no provisions of the INS–Esmor contract expressed an intent to confer a right of performance on any of the detainees and that the detainees had no basis to claim that they should be treated as third party beneficiaries under the contract. These findings require that Esmor's motion for summary judgment on the *Jama* Action plaintiff's third party beneficiary claims must be granted.

**B. Summary Judgment Standard:** Summary judgment will be granted if the record establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Rule 56(c) imposes a burden on the moving party simply to point out to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the burden then shifts to the opposition to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). The evidence need not be in a form that would be admissible at trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Further, a party may not simply "replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Rather, she must

"set forth specific facts showing that there is a genuine issue for trial." Rule 56(e).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* at 247, 106 S.Ct. 2505. In determining whether there exists a material issue of disputed fact, however, the facts and the inferences to be drawn from the facts are to be viewed in the light most favorable to the nonmoving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986).

In the following sections of this opinion the court will determine, applying the legal conclusions set forth earlier in this opinion, whether the various defendants in the *Jama* Action are entitled to summary judgment in their favor on some or all of the *Jama* plaintiffs' claims.

**C. *Esmor:*** Certain claims against Esmor have already been disposed of and upon which it is entitled to summary judgment. They are: i) the *Bivens* claims which allege that Esmor violated various of plaintiffs' constitutional rights, ii) claims brought pursuant to the Fair Labor Standards Act and iii) third party beneficiary claims under the INS–Esmor contract.

There is evidence in the record that precludes summary judgment in Esmor's favor on other claims. There is evidence to support the *Jama* Action plaintiffs' claims under the ATCA as has been discussed above. As discussed at length in the 2004 *Brown* Opinion, there is also evidence to support the *Jama* plaintiffs' claims under New Jersey state law based on Esmor's alleged negligent hiring, training, supervision and retention of its employees. The claim for failing to protect plaintiffs' property is subsumed within that claim. Esmor's motion for summary judgment on these claims will be denied.

■ There is also evidence to support the *Jama* plaintiffs' claims under RFRA. By way of example only: Kenneh testified that, in accordance with general practices, his Koran was taken from him at intake and that he was not allowed to have it in his dormitory. He was not allowed to perform ablutions at appropriate times. Bakar testified that Friday prayer was denied. Jama stated that requests for food other than pork were denied and the guards removed from her body the sheet required for prayer. No adjustment was made for timing of meals for Ramadan. For three days an officer stopped Muslims from praying. Guards would not let members of Pentecostal sects to pray out loud. Raji stated that in searches guards discarded religious items such as Bibles. These are but a few instances of episodes in which Esmor guards burdened a detainee's exercise of religion. At best it is a factual question whether these and other burdens placed on the detainees' exercise of religion were in furtherance of a compelling governmental interest and were the least restrictive means of furthering that compelling governmental interest. Accordingly, Esmor's motion for summary judgment on the *Jama* Action plaintiffs' RFRA claims will be denied.

For multiple reasons none of plaintiffs' surviving claims against Esmor are barred by the applicable statutes of limitations. The ATCA claims are subject to a ten-year limitation period and the RFRA claims are subject to a four-year limitation period. Those periods had not run when the *Jama* plaintiffs filed their complaint on June 16, 1997.

██ Nor is the New Jersey state law claim for negligent hiring, training, supervision and retention barred by the applicable two year statute of limitation. The filing of the *Brown* Action complaint on or about March 6, 1996 tolled that statute with respect to claims against Esmor (but not against the other defendants in this case). The offenses charged against Esmor were not only continuing offenses that persisted until the plaintiffs were removed from the facility; they occurred during the two-year period prior to March 6, 1996. The facility was in operation only from August 1994 until June 16–17, 1995.

**D.** *Esmor Officers:* The Esmor Officers against whom the Jama plaintiffs assert claims are James F. Slattery, President and Chief Executive Officer of Esmor and the person who had general responsibility for setting and implementing company policy; Willard Stovall, John Lima, Richard Staley and Aaron Speisman.

Speisman was Vice President of Esmor and had some role in surprising operations of the Facility, although the exact extent of his role is unclear. Staley was Vice President of Operations and had primary responsibility for overseeing the Elizabeth Facility.

There was shifting responsibility for on-site administration of the Facility. Lima apparently was administrator in April 1994 and during various periods thereafter until January 1995 when Willard Stovall became administrator and Lima reverted to becoming Stovall's assistant.

Stovall reported to Staley, with whom he spoke every day by telephone. Staley reported to Slattery.

When Lima was second in command of the Facility under Stovall, he had under him a chief of security with the rank of captain. Under the captain were three lieutenants, each of whom commanded a shift.

██ There was coordination with the INS, which stationed a representative at the Facility to ensure compliance with the INS–Esmor contract. Initially Michael D. Rozos was the INS's Contracting Officer and Technical Representative ("COTR"). Norman Uzzle replaced Rozos as COTR in March 1995. The COTR and an Esmor Official walked around the facility on a daily basis. Slattery testified that he toured the facility a few times and talked to detainees, who voiced complaints to him. Lima testified that Slattery visited as often as once a week and would sometimes stay for a week. Staley also visited the facility frequently and walked around the facility when he did so.

Stovall has presented evidence upon the basis of which a jury could conclude that the aggregate of the conditions of which plaintiffs complain did not constitute a deprivation of the minimal civilized necessities of life. *Young v. Quinlan,* 960 F.2d 351, 359 (3d Cir.1992). This evidence would bear importantly upon plaintiffs' ATCA and New Jersey negligence claims. He has also presented evidence upon the basis of which a jury could conclude that he had not been deliberately indifferent to any conditions of confinement or incidents of conduct which would allegedly violate the ATCA, RFRA or New Jersey negligence standards.

Stovall was responsible for administering the facility for only a short period of time—from January 25, 1995 through June 18, 1995. He cannot be held responsible for events that took place prior to January 25, 1995. Some of the evidence that Stovall produced portrays him in a highly favorable light, listening to detainee complaints, seeking to correct deficiencies in the conditions of confinement, addressing misbehavior of Esmor guards and general-

ly attempting to run the Facility in as humane and orderly manner as possible. For these efforts he even received expressions of appreciation from some of the inmates.

However, for summary judgment purposes, great as the likelihood that Stovall will ultimately prevail on the merits, may be, the court cannot grant Stovall's motion on the three remaining claims against him if there is some evidence from which a reasonable jury could find in favor of the plaintiffs. There is some such evidence. He walked around the Facility on a daily basis and attended weekly meetings with INS personnel, Esmor staff and representatives of the detainees. Thus he had intimate knowledge of the Facility and its problems.

There is testimony or other evidence to support each of the following allegations: i) For a period of time shackles were used when detainees had contact visits or court appearances; ii) shackles were used when detainees were placed in segregation; iii) during and after the June 18, 1995 riot detainees were abused by deprivation of food, beatings and other physical abuse—some of this abuse was inflicted by Esmor guards and some may have been inflicted by police and INS employees; iv) detainees were beaten; v) inmates were subject to verbal abuse including racial epithets and remarks; vi) inmates were sexually harassed, for example, by guards watching women take showers, ridiculing inmates's genitals, touching a male inmate's penis, sexually assaulting a female inmate in the laundry room; vii) unnecessary searches and pat-downs, particularly at night by the SERT team; viii) spoiled, under cooked, rotten and inadequate food, ix) physical facilities were unlighted and toilet and shower facilities lacked privacy; x) filthy clothing was provided and frequently inadequate or inappropriate clothing was pro-

vided; xi) toilets and showers remained in disrepair and inadequate cleaning supplies were provided, leading to unsanitary living quarters; xii) heating was defective and the cold of the winter was accentuated by inadequate clothing and the allocation of only one blanket to each detainee; xiii) lights were kept on for 24 hours of the day or night in dormitory areas, and sleep was further disrupted by loud talking and TV playing by the guards and middle of the night headcounts; xiv) there was virtually no outdoor recreation; xv) inmates were deprived of hygiene supplies such as sanitary napkins, toothpaste and tooth brushes; xvi) conditions in segregation were even more intolerable—cells soiled with feces, blocked toilets, lack of sheets or blankets; xvii) inadequate medical care and medication were provided; xviii) segregation was imposed on inmates without notice or hearings; xix) in a variety of ways detainees were denied access to counsel and the courts, e.g., limiting or denying phone calls to lawyers, guards remaining present during visits with lawyers, inadequate or non-existent law libraries or materials; loss or destruction of legal papers; xx) the property of detainees was taken from them and not returned; xxi) the inmates' right to exercise their religions was interfered with, whither Muslim, Hindu or Christian.

The Esmor Officers are charged with i) a Fifth Amendment due process claim based on the alleged failure to curb the pattern of abuse at the facility; ii) alleged violation of ATCA, iii) a First Amendment claim that they acted with deliberate indifference towards plaintiffs' attempts to exercise their religions; iv) violation of RFRA, v) violation of the Thirteenth Amendment by acting with deliberate indifference towards *Jama* plaintiffs engaging in forced, unpaid labor; vi) alleged violation of FLSA; and vii) negligent failure to protect plaintiffs' property and

negligent hiring, training, supervision and retention of Esmor's guards and other employees.

There is evidence that Stovall and Lima were fully aware of the deficiencies and abuses listed above. They learned of them through inmate complaints, guards' reports, INS complaints, inmate and staff meetings and personal observations. In view of their daily presence at the Facility it could hardly be otherwise. Through their supervisory roles, regular communication with Stovall and Lima and visits to the Facility it can be inferred that Slaterry, Speisman and Staley were also aware of these deficiencies at least in general terms, if not their specifics.

The Esmor Officers are entitled to summary judgment on certain of plaintiffs' claims. In light of the Court of Appeals decision in *Tourscher v. McCullough*, 184 F.3d 236 (3d Cir.1999) summary judgment will be granted in favor of the Esmor Officers on the FLSA claim. In a similar vein summary judgment in favor of the Esmor Officers will be granted on plaintiffs' claim under the Thirteenth Amendment based on alleged involuntary servitude. *Hause v. Vaught*, 993 F.2d 1079 (4th Cir.1993); *Bijeol v. Nelson*, 579 F.2d 423 (7th Cir.1978) (pretrial detainees may be required to perform "general housekeeping responsibilities consistent with the Due Process Clause").

For the reasons set forth in an earlier section of this opinion the *Jama* Action plaintiffs are precluded from bringing a *Bivens* claim against the Esmor Officers for violation of their federal constitutional rights. Therefore these officials are entitled to summary judgment in their favor on the *Jama* Action plaintiffs' Fifth, First and Thirteenth Amendment claims.

■ There is no evidence that any individual Esmor Officers personally engaged in conduct that would constitute intentional infliction of emotional distress, i.e., outrageous conduct that results in severe emotional distress. *Buckley v. Trenton Sav. Fund Soc.*, 111 N.J. 355, 544 A.2d 857 (1988). Further, plaintiffs do not have claims under the New Jersey Constitution. Summary judgment will be granted in favor of the Esmor Officers on those claims.

■ The two-year statute of limitation was not tolled by the filing of the *Brown* Action complaint with respect to the *Jama* Action plaintiffs' claims against the Esmor Officers because those Officers either were not named as defendants in the *Brown* Action complaint or were never served. Nevertheless, there is evidence that the conditions and conduct of which the *Jama* Action plaintiffs complain extended into the two year period prior to the filing of the *Jama* Action complaint and constitute continuing offenses. This requires denial of the Esmor Officers' motion for summary judgment on the *Jama* Action plaintiffs' claims based on negligent failure to protect plaintiffs' property and negligent hiring, training, supervision and retention of Esmor's guards and other employees. The ATCA claims are subject to a ten-year statute of limitations. As discussed in an earlier section of this opinion there is evidence to support the *Jama* Action plaintiffs' ATCA claims; there is also evidence to support their RFRA claims, which are subject to a four-year statute of limitations. The Esmor Officers' motions for summary judgment on these three claims will be denied.

**E. The Esmor Guards:** The Esmor Guards against whom the *Jama* plaintiffs have filed their complaint who have not been dismissed from this action are Michael Melendez, Okay Nkenke, Phillip Johnson, Kevin Brodie, Dorian Hunter and Michael Jackson. Each has moved for

summary judgment on all claims of each plaintiff.

**1.** *Hawa Abdi Jama:* Jama arrived at the Facility on August 24, 1994. She testified that she was shackled when she met with her attorney, during visitation periods and when she was placed in segregation. When the INS was notified of Esmor's policy of use of leg restraints on detainees for visitation and courts hearings, Esmor was directed to cease this practice on March 23, 1995. It would appear that any detainee present at the facility before that date was subject to this form of restraint. She also testified that in the aftermath of the riot when she was outside the facility she was not given food or drink during a twelve hour period. She recounts rough treatment apparently by the police (at least there is no evidence that it was by Esmor employees) during the riot.

Jama recounts that defendant Catrina Clark (against whom a default has been entered) beat her. An Esmor exhibit indicates that this took place on March 5, 1995. Jama was then placed in segregation without a hearing by Stovall. She mentioned the beating to Stovall and Lima. Clark kept working as normal, and Jama was kept in segregation for a week.

Jama, of course, like the other detainees was subject to the alleged general conditions and abuses previously described.

The only evidence that Jama produces that targets a particular guard is Clark's assault and her subsequent confinement in segregation by Stovall. Both of those incidents took place in March 1995 and thus the claims arising out of them are barred by the statute of limitations. In these circumstances all of the Esmor Guards are entitled to summary judgment in their favor on all of Jama's claims.

**2.** *Anantharajah Jayakumar:* Jayakumar was at the Facility from October 28, 1994 until the spring of 1995. Accordingly he has no claims connected to the riots. He testified that he was shackled when meeting with his attorney. Like the other detainees he was subject to the general alleged adverse conditions of the Esmor facility. He has produced no evidence of illegal conduct by the Esmor Guards, and consequently their motion for summary judgment on all his claims against them will be granted.

**3.** *Abu Bakar:* Abu Bakar was in the Facility from August 4, 1994 until its closing. He was granted asylum in 1997.

Bakar was shackled when he met with his attorneys. He was also shackled when he performed outside work, but his outside work did not continue until June 16, 1995. He was denied food during twelve hours after the riot. He was treated roughly at that time, apparently by the police.

Bakar testified that on one occasion guard Gill touched his penis as he was conducting a night time tour of the dormitory. Bakar complained to defendant Johnson who told him that if he continued to complain he would be put in segregation. Apparently Lima investigated the charge, confronted Gill and transferred Gill to another dormitory. Stovall received general allegations that Gill was homosexual and told Gill to leave his orientation outside the Facility. Stovall could not corroborate any specific allegations about Gill. According to Esmor's records the Gill–Bakar episode took place about April 28, 1995.

Bakar, too, was subject to the alleged adverse general conditions of the Facility. The only allegations he makes against specific guards are against Gill and Johnson. The claims arising out of those allegations are barred by the statute of limitations. The Esmor Guards' motion for summary

judgment on all of Baker's claims against them will be granted.

■ 4. *Cecilia Kou Jeffrey:* Jeffrey arrived at the Esmor Facility on April 13, 1995 and remained there until the riot. She arrived after the policy of shackling detainees for visitations, attorney visits and court hearings had ended.

She testified that Stovall was present while detainees were being verbally abused after the riot. She also testified that she was punched by a guard ("Michelle") when she asked for a tampon for another detainee. She discussed the attack at several meetings, and consequently it had to have occurred before the limitations period.

■ Jeffrey testified that she was frequently assaulted sexually by defendant Johnson when she worked in the laundry room. It is unclear from her account whether she was actually threatened or tried refusing to go to work in the laundry room, but she was afraid not to go. Two major incidents occurred in April 1995, during one of which Johnson's finger penetrated her vagina through her clothing. Jeffrey worked in the laundry room during her entire time at the facility until her last day there. Therefore it is possible that Johnson's behavior extended into a period not barred by the two-year statute of limitations. Further, this may prove to be a continuing violation which would bring the entire series of abuse within the limitations period. Summary judgment on the discrete claim against Johnson for sexual harassment must be denied.

Jeffrey was subject to the alleged adverse general conditions of the facility. In addition she testified that she was subjected to intrusive and embarrassing pat-down searches by the SERT Team. There is testimony that some members of the SERT team at night engaged in unnecessary and intrusive searches, but there is no evidence attributing this kind of conduct to any particular guards. The Esmor Guards are entitled to summary judgment in their favor on all of Jeffrey's claims other than a claim against Johnson for sexual harassment.

■ Plaintiff Jeffrey's sexual harassment claims against Esmor guard Johnson are not barred by the two-year statute of limitations, because it was a continuing offense that, according to Jeffrey, persisted through the last day the Facility was in operation, i.e., June 16–17, 1995. Her legal bases for that claim are the conduct constituted a violation of (i) the ATCA (which has a ten-year statute of limitations); (ii) the Fifth Amendment of the United States Constitution and (iii) New Jersey law.

It is readily apparent that the kind of conduct alleged does not rise to the level of a violation of customary international law. As stated above, it does not meet the strict requirements of *Sosa.*

As previously held in this opinion, *Malesko* does not bar a *Bivens* action by the plaintiffs against the Esmor Guards, although it does bar a *Bivens* action against Esmor and the Esmor Officers. Jeffrey is not an excludable alien; rather, she is a deportable alien. Deportable aliens are recognized as those who have entered the country and must undergo deportation proceedings to be removed. An excludable alien, on the other hand, is a person who has physically entered the country but who is held in custody and has not been determined to be admissible. *Leng May Ma v. Barber,* 357 U.S. 185, 188, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958) ("For over a half century this court has held that the detention of an alien in custody pending determination of his admissibility does not legally constitute an entry though the alien is physically within the United States.")

This distinction is significant, because while an excludable alien enjoys some constitutional protections, he or she does not enjoy the full panoply of constitutional rights. A deportable alien on the other hand, is entitled to all the protections the Constitution confers. Thus Jeffrey can pursue on constitutional grounds her sexual abuse claim against Johnson.

Jeffrey may also pursue her sexual abuse claim against Johnson on state law grounds. The motion of the Esmor Guards for summary judgment on all of Jeffrey's other claims against them will be granted.

■ 5. *Abraham Kenneh:* Kenneh was confined at the Facility from late 1994 until March of 1995. He returned in April, 1995, staying until the end of April or May 1995.

Kenneh was subjected to the use of shackles for visitation and court hearings during the period when it was Esmor's policy to use shackles in those circumstances. He may also have been subjected to the use of shackles when in segregation. He was physically threatened by Bowman after his second return from the Lehigh facility. Vanderspuye threatened him with deportation on a daily basis. Kenneh was subject to the alleged general adverse conditions at the Facility, but left the facility before June 16, 1995. He has not provided evidence to support a claim against any individual guard within the statute of limitations period. Consequently, the motion of the Esmor Guards for summary judgment on all of Kenneh's claims against them will be granted.

■ 6. *Dennis Raji:* Raji arrived at the Facility on April 10, 1995 and stayed there until its closing. He was subject to the use of shackles during the period when Esmor employed their use.

Raji testified that he was given no food or drink during a twelve-hour period outside the Facility in the immediate aftermath of the riot.

Raji provides specific evidence of physical abuse by the guards. He testified that Wallington beat him when he arrived at the facility on April 11, 1995. This was in connection with a theft of his money which will be referred to below. Raji was again beaten by Wallington when he was taken to segregation on April 19, 1995. Involved in this episode in one way or another were guards Nkenke, Brodie, Hughes, Jackson and Johnson. He requested and was denied medical care after the beating.

Raji testified that at the time of intake Wallington took money from him under circumstances described in detail in the discovery materials. After he complained about this theft he was beaten again and was placed in segregation shackled to his bed. He remained for 15 days before he was given a hearing. After serving 15 days discipline was imposed upon him for the number of days already served. Those implicated in these events are noted above. In addition Raji complained to McLean, (of the INS), Stovall, Lima, Uzzle (of the INS) and Walton while he was in segregation.

Raji, like the other plaintiffs, was subjected to the alleged general conditions of the Facility. His allegations against specific guards are barred by the statute of limitations, as they occurred before the two-year period and do not recount continuing violations. The motion of the Esmor Guards for summary judgment on all of Raji's claims against them will be granted.

■ 7. *Agatha Serwaa:* Serwaa arrived at the Facility on April 25, 1995 and stayed until it closed.

She was subject to the use of shackles during visitation and court hearings during

the period those devices were in use. She testified that she was beaten during the riot and its immediate aftermath but could not identify whether it was an Esmor employee, an INS employee or the police who beat her.

Serwaa describes the manner in which guards stared at her while she was showering, but named no specific guards. She was subject to the alleged general conditions at the Facility and recounts instances particularly applicable to her, for example the refusal one night by a guard to take her to a doctor when her breasts became painful.

Besides failing to name individual guards, it is evident that Serwaa's claims against the Esmor Guards are barred by the two-year statute of limitations. The Esmor Guards' motion for summary judgment on Serwaa's claims against them will be granted.

■ 8. *Shamimu Nanteza:* Nanteza arrived at the Facility on September 13, 1994 and remained there until its closing. She, too, was subject to shackling until the practice ceased. She recounts being assaulted and injured during the June 18, 1995 disturbance, but her allegation is against "John Doe Defendants" and it is not clear whether any Esmor employees were involved. She asserts that for her complaint of chronic headaches she was seen only by nurses and given only Tylenol.

Nantenza was subject to the alleged general conditions of the Facility but has not named any individual guard who committed an offense against her within the limitations period. Consequently the Esmor Guards' motion for summary judgment on Nantenza's claims against them will be granted.

■ 9. *Sarah Yower:* Yower arrived at the Facility shortly after January 30, 1995 and remained until it closed. She was subject to the shackling policies for the short period during which they remained in effect while she was there. She has offered no evidence of personal mistreatment during and immediately after the riot. Yower was subject to the alleged general adverse conditions in the Facility but has offered no evidence of actionable conduct of any individual guard during the limitations period. Consequently the Esmor Guards' motion for summary judgment on Yower's claims against them will be granted.

**10.** *Esmor Guards' Motions Generally:* With one exception the *Jama* Action plaintiffs' claims against the Esmor Guards cannot withstand the Guards' motions for summary judgment. In those instances in which a plaintiff can identify a particular guard as the perpetrator of actionable conduct against him or her, the claim is barred by the statute of limitations. In other instances where a plaintiff has provided evidence of actionable conduct by a guard, even if the statute of limitations is not a bar, the plaintiff has failed to provide evidence that a named defendant guard was the perpetrator of the act.

The only instance in which a guard's motion for summary judgment will be denied is in the case of Jeffrey's claim against Phillip Johnson for sexual harassment. There is some evidence that Johnson's conduct extended into a period within two years of the filing of the *Jama* Action complaint and is thus saved from the statute of limitations bar by the continuing conduct doctrine.

The foregoing does not preclude the *Jama* Action plaintiffs from introducing against Esmor and the Esmor Officers evidence of conduct of guards which does not support a cause of action against the guards themselves. Esmor may be re-

sponsible for the actions of the guards under the doctrine of respondent superior, and those actions may be relevant to claims against Esmor and the Esmor Officers that are not barred by the two-year statute of limitation.

### Conclusion

The motions of the various defendants in the *Jama* Action will be disposed of as follows:

The motion of the INS Officials, Michael D. Rozos, Earline D. Boyer, Alan Friese and Norman Uzzle, for summary judgment on all of the claims of the *Jama* Action plaintiffs will be granted.

Esmor's motion for summary judgment will be granted on the *Jama* Action plaintiffs' i) *Bivens* claims which allege that Esmor violated plaintiffs' constitutional rights under the First, Fifth and Thirteenth Amendments of the United States Constitution, ii) claims brought pursuant to the Fair Labor Standards Act, iii) third party beneficiary claims under the INS–Esmor contract; iv) claims brought under the New Jersey Constitution, and; v) their claims under New Jersey law of international infliction of emotional distress. Esmor's motion for summary judgment will be denied on the *Jama* Action plaintiffs' i) claims under the ATCA, ii) claims under New Jersey state law based on Esmor's alleged negligent hiring, training, supervision and retention of its employees, and iii) claims brought under RFRA.

The Esmor Officers' motion for summary judgment will be granted on the *Jama* Action plaintiffs' i) *Bivens* claims which allege that Esmor violated plaintiffs' constitutional rights under the First, Fifth and Thirteenth Amendments of the United States Constitution, ii) claims brought pursuant to the Fair Labor Standards Act, iii) claims brought under the New Jersey Constitution, and iv) their claim under New Jersey law of intentional infliction of emotional distress. The Esmor Officers' motion for summary judgment will be denied on the *Jama* Action plaintiffs' i) claims under the ATCA, ii) claims under state law based on Esmor's alleged negligent hiring, training, supervision and retention of its employees and iii) claims brought under RFRA.

The motions for summary judgment of Esmor Guards Michael Melendez, Okay Nkenke, Phillip Johnson, Kevin Brodie, Dorian Hunter and Michael Jackson will be granted on all claims of the *Jama* Action plaintiffs against them except for the claim of plaintiff Cecilia Kou Jeffrey against defendant Phillip Johnson for sexual assault, a claim which may be pursued as a *Bivens* claim for violation of the Fifth Amendment of the United States Constitution and as a claim pursuant to New Jersey state law.

The court will file an appropriate order implementing this opinion.